No. 2016-1051

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

PRIME DATUM, INC.,

Appellant,

v.

BALDOR ELECTRIC COMPANY,

Appellee.

---

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in *Inter Partes* Reexamination No. 95/002,286**

---

## OPENING BRIEF OF APPELLANT PRIME DATUM, INC.

Joseph Lucci
John Frank Murphy
BAKER & HOSTETLER LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104
(215) 568-3100

March 21, 2016

**FORM 9.  Certificate of Interest**

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Prime Datum, Inc.                    v.    Baldor Electric Company

Case No.     16-1051

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Prime Datum, Inc.                certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Prime Datum, Inc.

2.      The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

Prime Datum, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None

4.  ☒   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Robert Brown, Joseph Geller, James Muldoon, Anne Schneiderman, Neal Slifkin and Laura Smalley of Harris Beach PLLC; Joseph Lucci and John F. Murphy of Baker & Hostetler LLP

January 28, 2016                         /s/ Joseph Lucci
            Date                              Signature of counsel

Please Note: All questions must be answered

                                          Joseph Lucci
cc:      All counsel of record via ECF              Printed name of counsel

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT...........................................................1

INTRODUCTION.....................................................................................2

STATEMENT OF THE ISSUES..............................................................6

STATEMENT OF THE CASE ...................................................................7

I.    Prime Datum Invented and Patented the First Wet Cooling Towers
      Directly Driven by Permanent Magnet Motors................................7

      A.    The Productivity of a Refinery Hinges on Its Cooling Towers ............7

      B.    The Efficiency, Reliability, and Cooling Capacity of a Cooling
            Tower Is Driven By Its Fan and Drive System ....................................7

      C.    In Spite of Numerous Design Constraints, Prime Datum
            Realized that Cooling Tower Fans Could Be Improved by
            Replacing the Gearbox with an Efficient and Reliable Direct
            Drive Permanent Magnet Motor .........................................................11

      D.    The Patent Office Awarded Prime Datum the 028 Patent
            Covering Mr. Rollins's Team's Revolutionary Cooling Tower
            Drive System .......................................................................................15

II.   Baldor Requested *Inter Partes* Reexamination of the 028 Patent,
      Which Resulted in Rejection of All the Issued and Amended Claims
      of the 028 Patent ............................................................................17

      A.    The Examiner Adopted Baldor's Proposed Obviousness
            Rejections for Claims 1-11 over Hartman or Smith in
            Combination with ABB Motor and Further References ....................17

      B.    Prime Datum Rebutted Baldor's Combinations Using the ABB
            Motor References and Added Claims 12-24 in its Response and
            Amendment ..........................................................................................21

      C.    The Action Closing Prosecution Adopted Further Arguments
            from Baldor and Rejected All the Amended Claims ..........................24

D.    Prime Datum Rebutted the Positions of Baldor and The Examiner on the adopted § § 103 and 112 Rejections in Its Response to the ACP ........................................................................26

E.    After Right of Appeal Notice Reiterated the Earlier Rejections, Baldor Appealed to the Board ...........................................................27

III.   The Board Ultimately Affirmed the Examiner's Rejections on Appeal to This Court, Which in Turn Were Adopted from Baldor's Request .........31

IV.   Prime Datum Timely Appealed to This Court ...............................................33

SUMMARY OF THE ARGUMENT ......................................................................34

ARGUMENT .........................................................................................................39

I.    Standard of Review ........................................................................................39

II.   Claims 1-12, 14-22 and 24 Would Not Have Been Obvious ........................39

A.    The Prior Art Lacked Key Combinations of Technology that Mr. Rollins Invented and Claimed in the 028 Patent ..........................40

B.    There Is No Evidence of Motivation to Replace the Standard Indirect-Drive Induction Motor with a Direct-Drive Permanent Magnet Motor in a Cooling Tower ......................................................44

C.    All the Evidence Shows that One of Ordinary Skill Would Have Been Led Away from the Direct-Drive Permanent Magnet Motor in a Cooling Tower Proposed by Baldor and Adopted by the Examiner and Board ....................................................................47

1.    The Claims Are All Drawn to Cooling Towers with the Inventive Requirements ...........................................................47

2.    The Board Should Have Credited Prime Datum's Unrebutted Evidence that One of Ordinary Skill Would Not Have Been Led to Use ABB Motors for Direct Drive in a Cooling Tower Application ...............................................48

D.    The Method of Installing a New Fan Drive Claims Particularly Highlight the Nonobviousness of the Invention over the ABB References ...........................................................................................53

E.    The Claims Requiring an Air-Flow Sensor Feedback Loop
Particularly Highlight the Nonobviousness of the Invention
over the ABB References and Facão .................................................54

III.    Claims 12-22 and 24 Do Not Lack Enablement .............................................55

A.    Mr. Rollins's Testimony about the Difficulties in Adapting the
ABB ACS-800 Drive Cannot form the Basis of an Enablement
Rejection Because It Refers to Just One Embodiment .......................56

B.    There Is No Evidence that One of Ordinary Skill Would Have
Needed to Unduly Experiment to Practice the Claimed
Invention Once Provided with Prime Datum's 028 Patent.................58

IV.    Prime Datum Is Entitled to Claim Direct-Drive Permanent Magnet
Motors in Cooling Towers Broadly, Without Limiting the Claims to
Particular Embodiments .................................................................................59

CONCLUSION ..........................................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcon Research Ltd. v. Barr Labs., Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ..................................................58, 59

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
750 F.2d 1569 (Fed. Cir. 1984) ..................................................57, 58

*In re Brana*,
51 F.3d 1560 (Fed. Cir. 1995) ...........................................................55

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)...........................................................................39

*In re Elsner*,
381 F.3d 1125 (Fed. Cir. 2004) ........................................................39

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ........................................................39

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) ....................................................49, 57

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)...............................................................................39

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994) ............................................................48

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.*,
802 F.2d 1367 (Fed. Cir. 1986) ........................................................59

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007).....................................................35, 44, 45, 46

*In re Marzocchi*,
439 F.2d 220 (C.C.P.A. 1971) ..........................................................55

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ........................................................48

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
   303 F.3d 1294 (Fed. Cir. 2002) ...........................................................39

*In re Ratti*,
   270 F.2d 810 (C.C.P.A. 1959) ..............................................................49

*In re Sponnoble*,
   405 F.2d 578 (C.C.P.A. 1969) ......................................................49, 61, 62, 63

*Unigene Labs., Inc. v. Apotex, Inc.*,
   655 F.3d 1352 (Fed. Cir. 2011) ................................................................44, 45

*In re Wright*,
   999 F.2d 1557 (Fed. Cir. 1993) ........................................................56

## Statutes

28 U.S.C. § 1295(a)(4)(A) ...........................................................................1

35 U.S.C. § 102 ...........................................................................................17

35 U.S.C. § 103 ..............................................................................17, 26, 38

35 U.S.C. § 112 ........................................................................17, 25, 26, 55

35 U.S.C. § 134(b) ........................................................................................1

35 U.S.C. § 141 .............................................................................................1

## Other Authorities

MPEP 2164.0l(a) ........................................................................................25

## STATEMENT OF RELATED CASES

No other appeal in or from this action has previously been before this or any other appellate court. Counsel for appellant is not aware of any other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The United States Patent and Trademark Office Patent Trial and Appeal Board entered its decision on Prime Datum's appeal from the examiner's rejection of claims 1-22 and 24 of U.S. Patent 8,111,028 (the "028 Patent") in *inter partes* reexamination no. 95/002,286 on June 29, 2015.  The Board had jurisdiction under 35 U.S.C. § 134(b).  Prime Datum timely filed its notice of appeal in this Court on August 27, 2015.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.

## INTRODUCTION

The inventors of Appellant Prime Datum's 028 Patent recognized and solved a new problem in the field of industrial cooling towers. Industrial cooling towers provide critical cooling for processes that generate large amounts of heat, such as oil refineries, where cooling capacity can be the limiting factor for the output of an entire operation. Thus, operators rely on their regular and efficient operation. Prior to the invention of the 028 Patent, refineries used cooling towers that relied on fans driven by complicated drivetrains. In these drivetrains, the fan was driven by a right-angle gearbox directly connected to the fan hub. The gearbox, in turn, was driven by a low-torque, high speed electric induction motor positioned to the side of the tower. Skilled artisans relied on gearboxes to keep sensitive motors out of the harsh environment within the tower and convert the low-torque, high-speed output of the electric induction motor into a high-torque, low speed output suitable to drive a massive fan at speeds that would efficiently drive air upward through the tower.

The gearboxes in the prior art drivetrains frequently broke down and also required significant maintenance, resulting in both labor expenses and reduced industrial capacity due to cooling tower downtime. In 2003, Patrick Rollins and his fellow inventor George Lucas began investigating ways to improve the reliability of cooling tower gearboxes, which must operate in the hot, humid, and

corrosive environment in the cooling tower.

In the course of their investigations, Mr. Rollins and his team realized that they were addressing the wrong problem.  Instead of trying to improve the gearbox, Mr. Rollins's team realized that it should be eliminated entirely, and replaced with a motor that directly supports and drives the fan from below.  This radical approach was not favored in the prior art, because existing motors were too sensitive, too big, too weak, or otherwise not adaptable for this use.  Mr. Rollins's team solved this problem by using a high-torque, low-speed permanent magnet motor.  Although permanent magnet motors were rarely used in large-scale operations, and even then not in a compact, vertical arrangement bearing the heavy axial and radial loads imposed by the fan, Mr. Rollins's team looked past these disadvantages and set out to develop their revolutionary cooling tower drive systems.  They claimed the resulting invention in the 028 Patent.

Appellee Baldor Electric Company ("Baldor") requested an *inter partes* reexamination of the 028 Patent; proposing numerous combinations of up to eleven prior art references that allegedly showed that all the issued claims of the 028 would have been obvious.  Chief among these proposed rejections, and relevant to this appeal, Baldor proposed that a skilled artisan would have simply chosen a permanent magnet motor from a selection provided by a company called ABB, and install that motor in existing cooling towers.  The reason for this, according to

3

Baldor, was that ABB stated in its marketing materials that the motors were applicable in a variety of uses (none of which was for directly driving a cooling tower fan).

The examiner adopted most of Baldor's rejections in spite of the plainly lacking basis for obviousness. Prime Datum responded with, among other things, evidence that at the time of the invention, one of ordinary skill would not have looked to combine the ABB motors with known cooling tower arrangements. In fact, Mr. Rollins himself had attempted to make this combination during his team's investigations, and found the ABB motors entirely unsuitable for a variety of reasons. Mr. Rollins laid out his experiences in a detailed declaration to help Prime Datum rebut the obviousness rejection.

Ultimately, in spite of Prime Datum's efforts, the examiner refused to withdraw his rejections, and the Board affirmed them. Along the way, Prime Datum added several claims by amendment, but the examiner rejected those as obvious as well, for similar reasons. The examiner even rejected the new claims as lacking enablement, on the theory that since Mr. Rollins found that ABB equipment was not easily adapted for use in cooling towers, one of skill in the art must not be able to implement Mr. Rollins's own invention, even with the disclosure of the 028 Patent in hand. The Board adopted these rejections as well.

Prime Datum timely appealed to this Court, and argues below that the

4

Board's obviousness and enablement rejections were legal error and not based on substantial evidence.

## STATEMENT OF THE ISSUES

1.      Did the Board err in affirming the rejection of claims 1-12, 14-22 and 24 as obvious over certain prior art combinations by (i) failing to provide a reason for the combination; (ii) ignoring undisputed evidence that the combination was inoperative for its intended purpose; (iii) requiring the presence of claim limitations directed to the reasons the combination was inoperative; and (iv) requiring Prime Datum to not only rebut the proposed combination, but also every possible combination for every possible intended purpose.

2.      Did the Board err in affirming the rejection of claims 12-22 and 24 for lack of enablement by (i) mistakenly equating the standards for nonenablement and obviousness and (ii) relying on a single allegedly inoperative embodiment to conclude that the claim entirely lacked enablement.

## STATEMENT OF THE CASE

I.   **Prime Datum Invented and Patented the First Wet Cooling Towers Directly Driven by Permanent Magnet Motors**

A.   **The Productivity of a Refinery Hinges on Its Cooling Towers**

Many large industrial processing facilities such as power plants, petroleum refineries, and chemical plants cannot function without cooling towers.  JA111 at 1:19-27.  Refineries, for example, process hydrocarbons at high temperatures and pressures, control of which requires cooling water.  *Id.* at 1:30-31.  Once the water absorbs heat from a process, the water must be cooled down so that it can be reused in the process.  *Id.* at 1:32-43.  Cooling towers fill this essential role at the center of refinery control loops, and are thus "mission critical assets" for petroleum refinery production, because limitations on cooling capacity will restrict refinery output when heat cannot be removed at a sufficient rate.  *Id.* at 1:28-52.

B.   **The Efficiency, Reliability, and Cooling Capacity of a Cooling Tower Is Driven By Its Fan and Drive System**

A typical wet cooling tower is a basin of water with a tower positioned on top of the basin.  *Id.* at 1:57-2:8.  The top of the tower is open to sky, and the sides of the tower near the bottom have openings for air to enter.  *Id.*  The hot water enters the tower at the top, and sprays out so that it can fall through the tower into the basin below; typically though a porous fill material that facilitates contact between the water and air.  *Id.*  Cool air enters the tower at the bottom, rising

upward through the tower and cooling the warm falling water by evaporation and

heat exchange. *Id.* Large fans positioned at the top of the tower, sucking air up

from the bottom of the tower and blowing up and out of the top of the tower, can

help accomplish more cooling in a compact space. *Id.* The basic concept is shown

in schematic view on the left and photographically on the right:



JA1776; JA1913. The top of the cooling tower building is called the fan deck,

which is where the fan and its drive train are based (*Id.* at 2:9-20):



JA1915.  The open area show in the photograph is above the tower column itself,

and the fan and associated equipment are supported by the framework in the open

area, called the ladder frame.  JA1901 at ¶ 8.

Cooling tower fans operate in an extremely challenging environment.

Intense conditions are common, such as high humidity, icing conditions, wind

shear forces, corrosive water treatment chemicals, and demanding mechanical

drive requirements.  JA111 at 2:14-20.  As laid out in the 028 Patent, the

performance of a cooling tower depends on the performance of the fan, which in

turn depends upon the efficiency and reliability of the fan's drive system.  *Id.* at

2:14-66.

The typical prior art cooling tower fans were driven by high-speed low-

torque electric motors called induction motors.  *Id.*at 2:21-30; JA112 at 4:42-46.

Because induction motors are high-speed and low-torque, the output of the motor

shaft must be passed through a gearbox that increases torque on the fan and

reduces the number of rotations per minute between the motor shaft and the fan

(because, in effect, the fans turn relatively slowly but require a great deal of force

to turn). JA111 at 2:23-26. For example, prior art induction motors were

approximately 20 horsepower, rotating at 1400 to 1800 rpm, and connected to a fan

through a two-stage 8:1 reduction gearbox. JA1901 at ¶ 7. This typical prior art

drive system is shown below in on top of a fan deck 12:



JA105. The figure above shows the induction motor 14 connected through a

driveshaft 16 to a right-angle gearbox 22, which in turn drives the fan 27. JA112

at 4: 42-47. The fan and gearbox were mounted in the throat of the fan cylinder 10

so as to maximize the fan's ability to draw and move air through the tower; poor

positioning would ruin overall system performance. JA1901-2 at ¶ 9.

### C.  In Spite of Numerous Design Constraints, Prime Datum Realized that Cooling Tower Fans Could Be Improved by Replacing the Gearbox with an Efficient and Reliable Direct Drive Permanent Magnet Motor

The induction motor and gearbox-driven prior art cooling tower fans suffered from several serious drawbacks.  JA111 at 2:26-31.  They were subject to frequent outages, and required diligent maintenance, such as regular oil changes and lubrications, in order to operate effectively.  *Id.*  Further, the gearboxes absorbed some of the total power delivered by the motor, and typically required a separate gear to reverse rotational direction.  *Id.*  When analyzing over 20 years of operational service data, Prime Datum found that the most common failures and maintenance downtime were related to gearboxes — typically contamination of lubrication.  Maintenance and service can require shutting down the tower for up to two weeks.  JA1902 at ¶ 11.

Nonetheless, the industry found it essential to use induction motors and gearboxes because of the unique environment of the cooling tower.  JA1903 at ¶ 13.  First, the environment within the tower was wet and corrosive, which made it difficult to locate a motor directly under the fan.  *Id.*  Instead, the motor could be positioned on the fan deck off to the side, and connected to the fan via the drive shaft and gearbox.  *Id.*  This had the added advantage of avoiding any electrical connections in the cooling tower, because in many applications the cooling water could be contaminated by potentially explosive gasses.  *Id.*  Second, the gearbox

was significantly lighter than commercially available induction motors that could achieve the high torque necessary to drive the fan without a gearbox. JA1903 at ¶ 14. These larger motors were too heavy for the light ladder frames that would support them. JA1901 at ¶ 8; JA1903 at ¶ 14; JA1907 at ¶ 27.

Around 2003, Patrick Rollins and his fellow inventors began studying wet cooling tower technology with the goal of providing operators like Chevron with improvements on the state of the art. JA1899 at ¶ 3. Mr. Rollins's team initially focused on improving the gearbox itself, which was judged necessary at the time, but they eventually realized that the most dramatic improvement could be made by eliminating the gearbox entirely, substituting a motor for the gearbox and using it to directly drive the fan. JA1903 at ¶ 12. While it was not possible to achieve this using induction motors, as explained, Mr. Rollins's team realized that a different type of motor — permanent magnet motors — had the potential to work in this application. JA1904-05 at ¶ 19.

Permanent magnet motors had never been used for direct drive in wet cooling towers before. There was good reason for this. The vast majority of such motors were very small, with just a fraction of a horsepower. JA1903-04 at ¶ 15. Furthermore, permanent magnet motors were about three times the cost of induction motors for the same level of torque, because of the rare-earth, high-flux magnets involved in their construction. JA1904 at ¶ 17. There were some

industrial applications, such as in paper mills and extrusion plants, but there the

motors were mounted horizontally, and the application avoided the large axial and

radial loads present on a cooling tower fan. JA1903-04 at ¶ 15. When the direct

drive motor takes the place of the gearbox, not only must it hold up the dead

weight of the fan apparatus, but it must also withstand the loads generating by

spinning fan blades, which can generate substantial forces in multiple directions,

not unlike a helicopter. *Id.*

Cooling towers were an especially unlikely application for permanent

magnet motors. JA1903 at ¶ 13. First, the usual way of making a permanent

magnet motor more powerful is to lengthen it. JA1904 at ¶ 16. Although in a

typical, horizontal, application, this might not matter, in a cooling tower it is a fatal

drawback. *Id.* As described, cooling towers require the fan height to be at the

throat of the fan cylinder, so as to seal the cooling tower and pull up the air.

JA1901-02 at ¶ 9. Thus, because the fan cannot be moved upward, any direct drive

motor must fit vertically in the tight space between the ladder frame and the fan

hub, with the shaft pointing upward, which was not the typical configuration for

prior art permanent magnet motors. JA1904 at ¶ 16. Second, permanent magnet

motors operate hotter than induction motors because of their higher power density,

and that heat was considered undesirable in the already hot, moist, environment

above a cooling tower. JA1904 at ¶ 18. Third, because permanent magnet motors

13

were not used in the cooling tower field, engineers in the field lacked experience with them, and preferred familiar induction motors. *Id.* Fourth, existing catalog permanent magnet motors capable of generating sufficient torque to run the fan were much heavier than existing gearboxes, and the increase in load would have been catastrophic on typically wood or fiberglass ladder frames. JA1907 at ¶ 27.

Thus, Mr. Rollins's team successfully identified the problem with the gearboxes of existing cooling towers. JA1902 at ¶ 11. They then determined that the right solution was not to improve the gearbox, but entirely eliminate it. JA1903 at ¶ 12. Instead, Mr. Rollins's team invented a direct-drive cooling tower using a permanent magnet motor: reaching this conclusion in spite of overwhelming reasons to avoid permanent magnet motors in this application. *Id.* at ¶ 13.

Accordingly, Mr. Rollins's invention uses a cooling tower fan drive system with a high-torque, low speed permanent magnet motor, thus eliminating the need for a gearbox to convert the output of a low-torque high-speed induction motor. JA112 at 3:24-43. The permanent magnet motor can be mounted vertically, shaft-up, within the cooling tower, with the motor shaft directly connected to the fan hub within the cooling tower, thus eliminating the need for the drivetrain, gearbox, and associated maintenance. *Compare* JA106 *with* JA105. Mr. Rollins's additional improvements include a variable-frequency drive device to generate electrical

signals that energize the permanent magnet motor and fan (JA112 at 3:35-43), as well as a dual bearing system to support and secure the motor shaft in the motor casing, eliminating the maintenance required by the prior art cooling tower fan systems that included a drivetrain and oil-bath gearbox (JA114 at 40-45).

### D.    The Patent Office Awarded Prime Datum the 028 Patent Covering Mr. Rollins's Team's Revolutionary Cooling Tower Drive System

The 028 Patent describes and claims the invention described above: systems and methods relating to providing a high-torque, low speed permanent magnet motor, mounted within the cooling tower, with the motor shaft configured for direct connection to a fan hub within the cooling tower, and the rotational speed of the motor and fan controlled by use of a variable frequency drive. JA104-15. The examiner allowed the claims of the 028 Patent in the first office action, recognizing the inventiveness of the claimed invention. JA34. The issued claims, 1-11, are all involved in this appeal. JA2361. Generally, independent claim 1 is directed to cooling tower fan drive systems that include a permanent magnet motor directly connected to the fan hub in conjunction with a variable drive device. JA114. Independent claim 5 is directed to a method for installing such a fan drive system in a wet cooling tower. *Id.* And independent claims 9, 10, and 11 are directed to cooling towers that include a cooling tower fan drive system with a permanent

15

magnet motor directly connected to the fan hub in conjunction with a variable drive device.  JA114-15.

Claim 1 is generally illustrative of the claimed systems, and claim 5 of the claimed methods:

1. A drive system for driving a fan in a cooling tower, the fan comprising a fan hub and fan blades attached to the fan hub, the drive system comprising:

a high-torque, low speed permanent magnet motor comprising a motor casing, a stator and a rotatable shaft, the rotatable shaft being configured for connection to the fan hub, the motor further comprising

a dual bearing system consisting of a pair of radial bearings that locate and support the rotatable shaft relative to the motor casing; and

a variable frequency drive device to generate electrical signals that effect rotation of the rotatable shaft of the motor at a rotational speed in order to rotate the fan.

5. A method of installing a new fan drive system in a wet-cooling tower having a fan assembly that comprises a fan hub and a plurality of fan blades that are attached to the fan hub, the wet-cooling tower also having a preexisting fan drive system for driving the fan assembly, wherein the preexisting fan drive system has a gearbox, a drive shaft that drives the gearbox and an induction motor that drives the drive shaft, the method comprising:

disconnecting the gearbox from the fan hub and removing the gearbox;

removing the drive shaft;

removing the induction motor;

providing a high-torque, low speed permanent magnet motor comprising a motor casing, a stator and a rotatable shaft, the motor

16

further comprising a dual bearing system consisting of a pair of radial bearings that locate and support the rotatable shaft relative to the motor casing; and

connecting the rotatable shaft of the motor to the fan hub.

JA114 at 7:37-49.

## II.    Baldor Requested *Inter Partes* Reexamination of the 028 Patent, Which Resulted in Rejection of All the Issued and Amended Claims of the 028 Patent

Baldor filed its Request for Reexamination on September 14, 2012.  JA103. The requested proposed rejections for all 11 issued claims on a variety of grounds including 35 U.S.C. §§ 102, 103, and 112.  JA30-31.  Of those rejections, the only ones that survived examiner and Board review are several obviousness rejections under § 103 (JA2145), so the summary of the reexamination proceedings will be limited to those rejections as well as several new rejections made after Prime Datum added claims 12-24.  *Id.*

### A.    The Examiner Adopted Baldor's Proposed Obviousness Rejections for Claims 1-11 over Hartman or Smith in Combination with ABB Motor and Further References

For all of the obviousness rejections on appeal, Baldor's original proposal included two base references that could be applied in the alternative: Smith[1] and

---

[1] *Variable Frequency Drives & Cooling Towers*, Joliet Technologies. JA1776-7.

Hartman.[2]  According to Baldor, Smith and Hartman each disclosed a cooling

tower with an induction motor in a direct drive configuration.  JA62 (Smith); JA83

(Hartman).  Baldor then proposed combining Smith or Hartman with a set of four

references generally referred to as the "ABB Motor" (initially referred to as the

"DriveIT PM Motor").  JA63-83.  The ABB Motor reference is a collection of

documents, essentially a catalog, including several permanent magnet motors, and

some additional marketing materials.  JA186-269.  Baldor proposed further

references to meet the additional limitations of the claims, including a collection of

five references collectively referred to as ACS800, describing a drive for the ABB

Motors[3]; another collection of seven references collectively referred to as ACS800

Controller, describing a controller for the ACS800 drive;[4] and Facão[5] and

Schwedler,[6] allegedly describing still further limitations of the dependent claims.

In essence, Baldor's theory, ultimately adopted by the Board and on appeal

now, is that it would have been obvious to simply substitute the ABB Motor into

---

[2] U.S. Patent No. 6,257,007, issued July 10, 2001.  JA2363-73.
[3] JA270-6; JA277-365; JA366-414; JA414-593; and JA594-752.

[4] JA753-59; JA760-68; JA769-71; JA772-880; JA881-1327; JA1328-40; and
JA1341-1775.

[5] Facão et al., *Thermal Behavior of Closed Wet Cooling Towers for Use with
Chilled Ceilings*, Applied Thermal Engineering 20 pp. 1225-36 (2000).  JA163-
174.

[6] U.S. Patent No. 5,600,690, issued Feb. 11, 1997.  JA175-85.

either Smith or Hartman to reach the invention claimed in the 028 Patent. JA66.

In its Request, Baldor modified the drawings of Smith and Hartman to suggest that

each taught direct drive, even though this modification lacked substantial support

in the body of the references:



| Figure from Smith Article (Smith Decl., Ex. A) | Modified Figure in Request (Request at 29) |

JA1782; JA62. Hartman received a similar treatment, with Baldor taking a crude

schematic and assuming, contrary to the general practice in the prior art, and in the

absence of any supporting disclosure discussing how the motor drives the fan, that

the cooling tower was directly driven rather than indirectly. *Compare* JA83 *with*

JA2367.

Further, Baldor failed to provide specific citations within the ABB Motor

references that would identify any suitable motor from ABB that could be used in a

cooling tower. *See e.g.* JA63-65. Rather, Baldor merely cited to certain features it

claimed aligned with claim terms in various different motors. *E.g.* JA66
(identifying bearings).[7]

Notwithstanding these flaws, the examiner adopted Baldor's proposed
rejections in the Order Granting Request For *Inter Partes* Reexamination (JA1810-
1820) and the attached Non-Final Office Action (JA1821-1833) issued on
November 9, 2012. The examiner also adopted Baldor's supposed motivation to
combine Smith or Hartman with the ABB Motors, which was relegated to a
footnote in the Request and rooted entirely in two general marketing statements
that the motors could be used in "any" application. JA64 at n.13 (asserting that
two of the ABB references "implicitly disclose the use of the ABB drive system in
a wet cooling tower application. See, e.g. JA190 (ABB Drive IT PM Motor "could
be used in *any application* up to about 850 r/min"); JA259 (the ABB DriveIT PM
Motor "can be used in *any application*, where squirrel cage motors with a gearbox
would normally be used") (emphases added by Baldor).

---

[7] Baldor only identified specific ABB motors in it Response to Patent
Owners Response and Amendments filed on March 11, 2013, well after claims 1-
11 were rejected. JA1934-35 (identifying the ABB 280SM and 315SM motors). It
was also not until then that Baldor identified a prior art gearbox (the Amarillo
cooling tower right angle gear drive model 2016), in order to cite its dimensions
and allege that the 280SM and 315SM ABB motors could replace the model 2016
gearbox. JA1934; see also JA2001-03.

### B.   Prime Datum Rebutted Baldor's Combinations Using the ABB Motor References and Added Claims 12-24 in its Response and Amendment

Prime Datum filed its Response and Amendment by Patent Owner to the Non-ACP Office Action (JA1834-73) on February 11, 2003.  Prime Datum's response also included declarations of Mr. Rollins (JA1899-1919) as well as Dr. Duane Hanselman, an electrical engineer with a focus on brushless permanent magnet motors (JA1878-98).  Prime Datum also submitted a 2009 Baldor publication promoting Baldor's cooling tower motors and emphasizing the importance of those motors having the same vertical and footprint characteristics of the gearboxes they are to replace (JA1877) and that the motors must be "high torque, low profile." (JA1876).

Mr. Rollins's Declaration identified multiple reasons why the ABB motors were unsuitable for use at the time of the invention.  Remarkably, Mr. Rollins's team had actually attempted to use ABB motors from the same references cited by Baldor when it was implementing its invention.  JA1906 at ¶ 24.  Mr. Rollins's experience spoke volumes as to why one of ordinary skill in the art would not have been led to try combining ABB Motor with either Smith or Hartman.  Mr. Rollins testified, for example:

- The ABB motors were principally designed to be mounted on a concrete slab on a factory floor in a horizontal position without an axial load and

placing one vertically with the shaft up would impose a substantial axial load from the weight and thrust of the fan.  JA1903-04 at ¶ 15.

• ABB's smaller motors are not certified for use mounted vertically, but rather ABB required review of vertical mounting on a case by case basis, and those that are approved for vertical mounting are depicted only in shaft-down orientations, which would not allow them to replace the gearbox under the fan. JA1907 at ¶¶ 27-8.

• Those ABB motors designed to run vertically (even though in the shaft-down orientation) were simply too heavy to mount in a cooling tower.  *Id.* ("The separate cooled or liquid cooled version of the IEC frame size 500 motors, however, weighed at least 5,240 kg (11,552 lbs.)" and thus not "a suitable solution to the problem of replacing the prior-art gearboxes that were generally 800 to 1500 pounds sitting on cross beams within the cooling tower fan stack.").  *Id.*

• Those ABB motors designed to run vertically (even though in the shaft-down orientation) were far too long from the back of the casing to the end of the shaft to fit in the space occupied by the gearbox.  JA1861 (The smallest vertically mountable ABB motor would occupy over 99 vertical inches whereas most gearboxes had a maximum height of 33 inches); JA1907 at ¶ 27.

Prime Datum also argued that neither Smith, nor Hartman disclosed the use of a direct drive permanent magnet motor.  JA1862-65 (Smith); JA1865-69

(Hartman).  With respect to the Facão reference, cited by the requestor for the use of an airflow sensor in a cooling tower (per Claims 9 and 11), Prime Datum also argued that Facão does not disclose the use of an airflow sensor in a feedback loop that generates signals to interface with a variable frequency drive ("VFD").  JA1868; JA1870.

In its Response of February 11, 2013, Prime Datum also submitted amended claims 12-24, directed to still further embodiments of the claimed invention, but bearing general similarities to claims 1-11.[8]  JA1838-42.  Claims 12 and 24 are independent claims deriving from the disclosure of the 028 Patent.  For example, claim 12 is directed to a drive system for directly driving a wet cooling tower fan comprises a high-torque, low-speed permanent magnet motor and a VFD that generates electrical signals that control rotation of the motor, in order to rotate the fan.  JA108; JA112 at 3:28-35.  The motor further comprises a rotatable shaft that is configured for connection to the fan hub (JA106; JA113 at 5:31-38), and bearings that support the shaft and the full weight of the fan, and loads imposed by the fan (JA110; JA113 at 5:38-39).  The drive system also includes vibration sensors located within the motor casing, temperature sensors within the motor casing, temperature sensors in the cooling tower basin, an airflow sensor

---

[8] Claim 23 was rejected and not appealed, and thus is not at issue in this appeal.

downstream of the fan, and a computer that processes the sensor feedback signals (JA110; JA113-14 at 6:13-7:16). The processor, the VFD, and the sensors form a feedback loop that adjusts the speed of the motor (JA110; JA113 at 6:13-58).

In its remarks, Prime Datum argued that the new claims were patentable for the same reasons with respect to the ABB Motors, Smith, Hartman, and Facão references. JA1869-70. Prime Datum further distinguished the new claims over Facão arguing that Facão merely used an airflow sensor to take measurements to determine whether the operating correlations were the same in a particular tower configuration when the tower operated with a chilled ceiling air conditioning system as opposed to a traditional air conditioning system. JA1870.

### C. The Action Closing Prosecution Adopted Further Arguments from Baldor and Rejected All the Amended Claims

The examiner issued the Action Closing Prosecution on April 24, 2013. JA2008-41 (generally adopting the views espoused by Baldor in its Comments to Prime Datum's Response and Amendment). In particular, the examiner rejected Prime Datum's rebuttal to the obviousness rejections on claims 1-11 (JA2336-39); rejected claims 12, 14-22, and 24 for similar reasons (JA2021-30); and rejected claims 12-22 and 24 for lack of enablement (JA2015). Claim 13 was not rejected on obviousness grounds. (JA2021).

The examiner rejected Prime Datum's evidence that a person of skill would not have sought to combine Smith or Hartman with ABB Motors for two reasons. First, the examiner rejected the premise that Mr. Rollin's team's experience with ABB motors was evidence of nonobviousness because it failed to address every possible cooling tower or every possible imagined specification for a cooling tower. JA2037. Second, the examiner agreed with Baldor that Prime Datum's evidence did not deserve weight because the claims did not contain limitations directed to the specific reasons why a person of ordinary skill would have found ABB Motors unsuitable. JA2021; JA2036-37 (referring to what Baldor called "phantom" claim limitations).

The examiner adopted Baldor's § 112 arguments that claims 12-22 and 24 were not enabled. JA2015. The examiner determined that "none of the findings as to undue experimentation factors are necessary, see MPEP 2164.0l(a), since the patent owner has already admitted that it would take undue experimentation to make or use the invention using known off the shelf parts." This alleged admission arose in the declaration of Mr. Rollins when he was recounting his experiences attempting to use an ABB ACS800 drive with a beta-test cooling tower motor of his own design. JA1941; *see also* JA1909-10. Mr. Rollins stated in his declaration that

> Once we created a prototype permanent magnet motor
> ("the beta-test motor") meeting all of our design criteria,

> we tried using the ABB ACS-800 VFD to drive **the beta-test motor** as now suggested in the Request. However, our experience indicated that the ACS800 Drive was not readily combinable with a permanent magnet motor. We experienced several problems with the ACS-800, specifically: the switching frequency of the drive required us to unduly experiment to mitigate the voltage spikes created by the ACS-800.

JA1910 (emphasis added).  Baldor argued, and the examiner accepted, that because Mr. Rollins stated that one particular drive (the particular drive offered by Baldor as part of its obviousness combination) would not work in unmodified form with his prototype motor, his invention is not enabled.  JA2015.

### D.    Prime Datum Rebutted the Positions of Baldor and The Examiner on the adopted § § 103 and 112 Rejections in Its Response to the ACP

Prime Datum filed a Response to the Action Closing Prosecution on May 24, 2013 (JA2093), rebutting the examiner's new positions.  First, even though the examiner did not appear to rely on it, Prime Datum rebutted the specific example cited by Baldor in its March 11, 2013 Comments of using an ABB 280SM or 315SM motor to replace an Amarillo Model 2016 gearbox.  JA2059-66.   Prime Datum pointed out, for example, that Baldor erroneously considered only the overall height of the gearbox and motor, ignoring that the gearbox height included the 15 inch motor shaft, which is almost entirely embedded in the hub of the fan.  JA2059-60.  Prime Datum also showed that the ABB motors would have required adaptors to fit in the fan hub, exacerbating the overall length problem (JA2062-63),

and that the Model 2016 had over ten times the torque output of the cited ABB

280SM and 315SM, which produced maximum torques of 788 and 1,173 foot-

pounds respectively (JA2061).

Second, Prime Datum also pointed out that the examiner had muddled the

standards for obviousness and enablement by taking Mr. Rollins's experience with

the unsuitability of one particular drive (the ACS 800 Drive cited by Baldor in its

proposed rejections) and concluding that no drive existed that could enable the

claimed invention without undue experimentation. JA2053-54. Prime Datum

explained that "[o]nce in possession of the invention, one skilled in the art would

have been able to select or design a suitable motor, just not the motors proposed by

the Requester in the ABB Motor References." JA2053.

### E. After Right of Appeal Notice Reiterated the Earlier Rejections, Baldor Appealed to the Board

The examiner issued the Right of Appeal Notice issued on September 13,

2013. It maintained all the prior rejections. *See generally* JA2104-2137. The

examiner repeated his obviousness and enablement reasoning essentially verbatim

from the Action Closing Prosecution. *Compare* JA2113-14 *with* JA2015-16;

*compare* JA1829-31 *with* JA2018-20 and JA1829-31. Prime Datum filed its

appeal to the Board on February 4, 2014, challenging the rejection of claims 1-12,

14-22, and 24 as obvious, and claims 12-22 and 24 as lacking enablement.

Prime Datum argued that neither Baldor nor the examiner had ever formulated a specific reason, based in the record, for why a person of skill would have sought to use a permanent magnet motor in a cooling tower. *See e.g.* JA2069-70. Furthermore, Prime Datum highlighted the unrebutted evidence of record showed that the proposed obviousness combination was unsuitable for its intended purpose. For example, Prime Datum showed that the ABB Motor reference did not offer a suitable permanent magnet motor for use in cooling towers, pointing to evidence offered by Prime Datum and not rebutted by Baldor.[9] For example, only the largest 500 and 560 series motors from ABB were designed for off the shelf use in a vertical mounting position, and those were (i) too long to occupy the space occupied by a prior art gearbox, (ii) far too heavy to be mounted on a fan deck, (iii) were only disclosed in vertical shaft-*down* orientations, and (iv) were not disclosed to be usable with significant axial loads such as the weight of a cooling tower fan or loads created by the fan's thrust. JA2165-67. Prime Datum also pointed out that Baldor's arguments that one of the largest cooling tower gearboxes on the market (the Model 2016) could be replaced by replaced by the smallest ABB motors (the 280 and 315) demonstrate that the ABB motors are

---

[9] Prime Datum also argued that it was prejudiced by Baldor's failure to allege any specific, suitable ABB motor in the Request because this failure deprived Prime Datum of the opportunity to offer amendments and argument tailored to a specific combination of art until prosecution was closed. JA2162-63.

nonobvious because those motors were too large to fit in the available space (especially when considering the necessary shaft adaptor), and their maximum torque was less than one-tenth the minimum torque of the Model 2016. JA2168-70.

Prime Datum also showed that the examiner erred in adopting Baldor's argument that the ABB motors inherently disclosed a shaft configured for connection to the fan hub. JA2173-75. Prime Datum explained that "[c]onnection to a fan hub is not inherent in the motor shaft, since there are a variety of loads and means of connection available." JA2174. Prime Datum provided unrebutted evidence that the shafts of the ABB motors would necessarily have to be modified with respect to both length and diameter to connect to standard fan hubs. JA2174 (*citing* JA1906 at ¶ 28); JA2170 (the Model 2016 gearbox has a drive shaft 7.50 inches in diameter and 15 inches in length versus 2.95 by 5.51 for the 280SM and 3.15 by 6.69 for the 315SM). Prime Datum argued that the examiner's failure to account for the connection of the hub to the motor was especially problematic for method claims 5-8, which expressly require implementing such a connection in an existing cooling tower. JA2173-75.

Prime Datum outlined other flaws with the references. For example, Prime Datum showed that neither primary cooling tower reference, Smith or Hartman, disclosed a permanent magnet motor, or taught or suggested replacing the gearbox

with a direct drive permanent magnet motor, much less provided any evidence

contrary to that provided by Prime Datum about the unsuitability of ABB Motor.

JA2179-80 (Smith); JA2175-79 (Hartman).

Prime Datum also argued that the rejections of claims 9, 11, 12, 14-22, and

24 in further view of Facão were flawed.  JA2074; JA2077-82.  Each of these

claims requires an air-flow sensor that outputs a signal in a feedback loop to allow

the VFD to control the speed of the fan.  Prime Datum showed that Facão

described the use of an air-flow sensor to collect experimental data of a cooling

tower operating under only steady state conditions, but not as part of a feedback

loop or describe any kind of control loop at all.  JA2180-82.

Finally, Prime Datum argued that the examiner should not have rejected

claims 12-22 and 24 for lack of enablement.  JA2159-62.  As Prime Datum had

asserted throughout the reexamination, the fundamental invention of the 028 Patent

is the realization that in spite of their apparent necessity, gearboxes could be

eliminated, and in spite of their perceived shortcomings, permanent magnet

motors, energized by a variable-frequency drive, directly support a cooling tower

fan to drive the fan.  JA2227.  Prime Datum pointed out that there was no dispute

in the record that a person of ordinary skill in the art would have had training and

experience with electrical motors and fans in cooling towers, and that Baldor never

offered any evidence whatever to show that such a person, once presented with

30

Prime Datum's invention, could not have designed or selected the necessary components without undue experimentation. JA2228. Thus, Prime Datum argued that the examiner erred by disregarding the factual record and conflating the nonobviousness of combinations that included ABB's unsuitable parts with the unsupported premise that no suitable parts were available.

### III. The Board Ultimately Affirmed the Examiner's Rejections on Appeal to This Court, Which in Turn Were Adopted from Baldor's Request

On June 29, 2015, the Patent Trial and Appeal Board issued its decision affirming the examiner's rejections. JA1. In reference to the Board's numbering, rejections 2-6 and 13 relate to the combination of Smith with ABB Motor and other references (JA7); 7-12 and 14 related to the combination of Hartman with ABB Motor and other references (JA8); and 1 was the rejection of claims 12-22 and 24 for lack of enablement (JA7).[10] Claim 13 remains unrejected on obviousness grounds.

The Board affirmed the obviousness rejections without identifying any particular reason to make use of any permanent magnet motor in a cooling tower, much less those of the ABB Motor reference. Instead, the Board summarily adopted the examiner's statement that "direct drive permanent magnet motors are

---

[10] The Board also had before it Baldor's cross appeal on issues that Prime Datum won before the examiner. The Board did not reach these issues because it affirmed the examiner's rejections that Prime Datum appealed. JA021.

known and can replace traditional indirectly driven gearbox-type motors in any application," which in turn derived from the nonspecific statements in ABB marketing material discussed above.  JA21.

Like the examiner, the Board also disregarded Prime Datum's undisputed evidence that the alleged obviousness combination would have been unsuitable for its intended purpose.  *Id.*  First, the Board stated that Prime Datum could not rely on the design constraints outlined in Mr. Rollins's declaration, because those constraints were not captured in the limitations of the 028 Patent claims.  JA16. Second, the Board held that Prime Datum's evidence was insufficient because it did not show that a person of ordinary skill would not have sought to use a permanent magnet motor regardless of the chance of success, perhaps to achieve a less functional cooling tower.  JA2016-17.  Third, the Board held that because the obviousness rejection relied on a combination of references, it was improper for Prime Datum to attack the suitability of any individual reference.  JA18.  The Board also adopted the examiner's reasoning relating to Smith and Hartman's failure to show connection of the motor shaft to the fan hub (JA17-18), and Facão's failure to show a feedback loop (JA20).

Finally, the Board affirmed the enablement rejection without identifying any evidence submitted by Baldor showing that one of ordinary skill would not have been able to make or use the claimed invention.  JA9-13.  Instead, the Board

concluded that the claims were not enabled because the patent failed to warn away from the use of a single incompatible variable drive (the ACS800) that Mr. Rollins had experimented with in connection with a beta-test motor he had made.  JA11-12.  The Board, like the examiner, conflated Mr. Rollins's statements about the unsuitability of the ACS800 drive into an admission that the "the scope of protection provided by that claim is not adequately enabled by the description of the invention provided in the specification of the application.  *Id.* (citation omitted).

## IV.    Prime Datum Timely Appealed to This Court

Prime Datum timely filed its Notice of Appeal to this Court on August 27, 2015.  JA2360-62.

## SUMMARY OF THE ARGUMENT

1.    **Obviousness.**

The Board erred by affirming the examiner's rejection of claims 1-12, 14-22, and 24.  The invention claimed in the 028 Patent is indisputably novel, and no reference discloses a permanent magnet motor directly driving a fan in a cooling tower.  The rejections on appeal combine the primary references Smith or Hartman with ABB Motor, and further references as needed for each claim.  These rejections should be reversed because they are based on an over-reading of the prior art, lack even the most basic motivation to combine the references, and cannot be sustained in view of Prime Datum's undisputed evidence that one of skill in the art would not have sought to combine Smith or Hartman with ABB Motor.

First, the Board misread the prior art, for example by viewing Smith and Hartman as teaching one of skill in the art that direct drive in a cooling tower was desirable.  Neither Smith nor Hartman teach anything about the desirability of direct drive, how to implement direct drive, or anything of substance.  Rather, Smith mentioned the concept once in passing, and Hartman includes a schematic that shows a motor powering a fan without any disclosure of how power is transmitted from the motor to the fan.  The Board's thus erroneously smoothed the path to finding it obvious to swap in a permanent magnet motor in these allegedly direct-drive configurations.

Second, the Board should have reversed the examiner's rejection at its root, regardless of Prime Datum's rebuttal evidence. Obviousness law requires that any combination of prior art references be motivated by some logical reasoning, whether it be the literal teaching of the art, market forces, the collective knowledge of the field, or the like. The rejection here is based on two single-line statements among the ABB marketing materials that state that ABB motors have wide applicability. This is not the type of particularized reasoning required by *KSR* and its progeny. Indeed, if that were enough to form an obviousness rejection, few, if any, mechanical inventions would be patentable.

Third, the Board should not have disregarded Prime Datum's rebuttal evidence. In response to the combination proposed by Baldor and adopted by the examiner, Prime Datum provided detailed evidence from Mr. Rollins and Dr. Hanselman laying out numerous technical reasons why Baldor's specific combination would not have worked for its intended purposes. The ABB motors were too big, too heavy, too weak, and couldn't be arranged in the correct configuration for a cooling tower application.

The Board's failure to credit Prime Datum's evidence was legal error. First, the Board held that Prime Datum's claims lacked limitations to all the particular design requirements necessary to implement permanent magnet motors in cooling towers — but there is no such rule in obviousness law, nor should there be.

35

Second, the Board held that Prime Datum had to show that the prior art taught one of skill in the art away from using permanent magnet motors in all wet cooling tower applications — but Prime Datum fully and correctly rebutted the one and only actual obviousness rejection at issue, which was based on ABB Motor and the cooling towers set out in Smith and Hartman. Nor did Prime Datum have to show that there was no possible application of the poorly suited ABB Motor and the prior art cooling towers. Third, the Board erroneously prohibited Prime Datum from attacking references individually and showing that they lacked key teachings. In particular, the fact that no reference met the claim limitation requiring a permanent magnet motor shaft coupled to a fan hub is crucial support for Prime Datum's evidence that persons of skill would not have attempted to make such a connection.

Additionally, the Board erred by overlooking claim 5 and the other claims directed to methods of installing a new fan drive in an existing cooling tower. These claims are specifically directed to the act that Mr. Rollins testified would have been completely contrary to the conventional wisdom in the field, and the cursory rejection of these claims draws more attention to the Board's specious reasoning. And similarly, the Board's summary adoption of the examiner's rejection of claims 9, 11, 12, 14-22, and 24, including an air-flow feedback loop in view of Facão lacked basis in any reference or combination of references.

## 2.    Enablement

The Board erred by affirming the examiner's rejection of claims 12-22 and 24 as lacking enablement.  Baldor never offered, and the examiner never identified, any independent reason why a person of ordinary skill would not have been able to make and use the invention provided in claims 12-22 and 24 of the 028 Patent. Instead, the examiner based his rejection entirely on a single statement by Mr. Rollins made to support Prime Datum's nonobviousness arguments.  Mr. Rollins was addressing Baldor's proposed obviousness combinations, which all involved ABB Motor and the ACS800 Drive.  Mr. Rollins related his own experience of difficulties attempting to combine the ACS800 Drive with a beta-test motor of his own design.  The examiner concluded based on this single experience, that one of skill in the art could not make or use the claimed invention, and the Board agreed.

The Board made two mistakes.  First, the Board erroneously extrapolated a single inoperative embodiment to the conclusion that the claims were not enabled. The law is clear that even if some claimed combinations were inoperative, the claims are not necessarily invalid.  Nor are claims required to exclude inoperative embodiments.  Neither the Board, nor the examiner, ever attempted to show that the problems with the ACS800 were indicative of the art as a whole.

Second, the Board neglected to make a factual showing that a person skilled in the art, *with the 028 Patent in hand*, would nonetheless not have been able to

37

implement the invention without undue experimentation.   As Mr. Rollins explained in great detail, a person skilled in the art would not have looked to the ABB Motor and ACS800 Drive, and instead, with the 028 Patent in hand, would have had the full extent of the knowledge in the field available to him to implement the invention.  The Board erred by failing to base its finding of no enablement on the skilled artisan's full knowledge.

3.     **Relief Sought.**

In view of these errors, Prime Datum respectfully requests that this Court reverse the Board's decision that claims 1-12, 14-22, and 24 would have been obvious under § 103 and that claims 12-22 and 24 lacked enablement.

# ARGUMENT

## I.     Standard of Review

Enablement and obviousness are questions of law, based on underlying factual findings.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *In re Elsner*, 381 F.3d 1125, 1127 (Fed. Cir. 2004); *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002).  This Court reviews the Board's legal conclusions de novo,  *Elsner*, 381 F.3d at 1127, and the Board's factual findings underlying those determinations for substantial evidence, *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## II.     Claims 1-12, 14-22 and 24 Would Not Have Been Obvious

All the obviousness rejections on appeal rest on the same flawed premise: that the invention of the 028 Patent is as trivial as ordering a prior art ABB permanent magnet motor and installing it into a prior art cooling tower to directly drive the fan, for no reason other than that such motors can be used in any application because the ABB motor catalog says so.[11]  This "parts is parts"[12]

---

[11] *See* JA015-16 (Board Decision); JA2133 (RAN); JA64 at n. 13 (Request).

[12] A 1983 ad campaign for Wendy's restaurants suggesting that Wendy's competitors treat all parts of the chicken alike for purposes of preparing their dishes.

approach to obviousness cannot be sustained in the undisputed factual context of this invention.

### A.    The Prior Art Lacked Key Combinations of Technology that Mr. Rollins Invented and Claimed in the 028 Patent

There is no dispute that the claims of the 028 Patent are novel.  No one before had implemented a permanent magnet direct drive motor in a cooling tower. Thus, although the prior art contains many individual limitations of claims 1-12, 14-22 and 24 of the 028 Patent in isolation, the proposed obviousness combination is not trivial, in some cases requiring six different references.[13]  Nor are most of the significant limitations in one reference, with only minor variations captured in the others.  Rather, the most important aspect of each claim, at the heart of the invention — a cooling tower with a fan directly driven by a permanent magnet motor —requires at least two references under Baldor's theory: the primary references Smith or Hartman, and the secondary reference ABB Motor.  *See e.g.* JA61-65 (Smith); JA83-84 (Hartman).

Claims 1-12, 14-22 and 24 all begin by requiring at least a cooling tower with a motor in a direct drive configuration.  JA1835-42.  Baldor urged the examiner to read block diagrams in the two primary references, Smith and

---

[13]  *See* JA075-80 citing to Smith, The Rollins admitted prior art, ABB Motors, ACS800, AC800, and Facão as the alleged alternative obviousness combination for claim 9.

Hartman, as disclosing cooling towers with motors directly driving the fans.  JA62

(Smith); JA83 (Hartman).  But even a cursory inspection of Smith (JA1776-77)

and Hartman (JA2363-73) reveals that the references were not focused on the

question of whether to directly drive the fan or indirectly drive it through a

gearbox, and teach nothing of value about that issue.  The references did nothing to

dispel the undisputed record that the traditional prior art configuration was

gearbox-driven.  *Id.*  Nor do the diagrams in the references convey any real-world

information about the fan drive configuration; they are clearly only intended as

placeholders for the discussions in the references about control methods (e.g., in

Smith, the rectangle that Baldor labels as the motor is *above* the fan (JA62), and in

Hartman, what is labeled as the motor is floating in midair (JA83)).

Smith, for example, focuses entirely on the concept of variable-frequency

drive in a cooling tower, nowhere explaining how or why a direct drive motor of

any kind, much less a permanent magnet direct motor, would be useful.  *E.g.*

JA1776 col. 2.  Smith touts its variable-frequency drive as follows: "Eliminates

Mechanical Shock and Stress on Power Train (couplings, belts, drive shafts, gear

boxes, etc.)," which advantages would be irrelevant in a direct-drive system.

JA1777 at col. 3.  Smith mentions direct drive only in passing, when explaining

that for direct connected or belted cooling tower fans, a low minimum speed does

not present the problems that it could with a gearbox.  JA1776 at col. 3.  Nor can

41

Baldor's interpretation of Smith's figure be taken seriously, because that would place the motor on top of the fan, which is antithetical to all design premises of this technology area. Further, as Dr. Hanselman explained, Smith's discussion of variable frequency drive via the ACS800 further reinforces Smith's focus on induction motors. JA1776.

Hartman, for its part, concerns methods for controlling a cooling system using a variable-frequency drive. JA2370-71 at 2:66-3:28. But Hartman nowhere discusses how the motor delivers power to the fan. Rather, Hartman simply identifies the fan and the motor in a rough schematic (which conveys no information about the real-life configuration of the fan drive) and refers to "a fan (215) driven by an electric motor (216)." JA2370 at 1:66-7. The minimal or non-existent disclosure of direct drive in Hartman and Smith cannot bear the weight of Baldor's obviousness theory, adopted by the examiner and affirmed by the Board.

The dearth of evidence in the record of direct-drive cooling towers is particularly important because the claims of the 028 patent require, e.g., "the rotatable [motor] shaft being configured for connection to the fan hub" (JA114-15 at Claims 1-4), "the rotatable shaft being connected to the fan hub," (JA114-15 at Claims 9-11) or "connecting the rotatable shaft of the motor to the fan hub" (JA114 at Claims 5-8). That linkage is particularly important because any motor selected must replace the prior art gearbox, which includes all the loads transmitted

through that linkage.  And that linkage in particular is missing from the record evidence, yet the record is replete with evidence submitted by Prime Datum that one of ordinary skill would not have sought to make the claimed connection with a permanent magnet motor.  JA2059-60; JA2174 (*citing* JA1906 at ¶ 28); JA2170.

An additional failure of the prior art is that no combination of prior art discloses what claims 9, 11, 12, 14-22, and 24 all require: a sensor that provides an output signal representing airflow, and that this is part of a feedback loop to control the speed of the motor driving the fan.  JA113 at 6:13-23; JA114-15 (claims 9-11); JA1838-42 (Claims 12, 14-22, and 24).  For example, claim 9 requires "a processor to process the signals outputted by the . . . air-flow . . . sensors and generate control signals for input into the" variable frequency drive.  JA114-15.  The rejection on appeal suggests that this feedback functionality is taught by a combination of Facão and the ACS800 Controller.  JA20.  But Facão fails to provide disclosure of this feedback loop, and neither the Board nor examiner ever explained otherwise. Instead, Facão discloses using sensors to monitor the cooling tower to study its efficiency and function.  JA168.  Nor does the ACS800 Controller provide the loop, instead providing a controller capable of receiving feedback signals generally.  But neither reference, nor the combination, sets out the necessary logic for a feedback loop from the air-flow sensors to the drive.

**B.    There Is No Evidence of Motivation to Replace the Standard Indirect-Drive Induction Motor with a Direct-Drive Permanent Magnet Motor in a Cooling Tower**

To show that a claim would have been obvious, the Patent Office must articulate some reason why a person of ordinary skill in the art would have been led to combine the prior art to reach the claimed invention.  This requirement provides a check against hindsight by preventing a challenger from simply identifying each claim limitation in a different piece of prior art and calling the sum total obvious.  This requirement does not vanish simply because one piece of prior art declares its disclosure universally applicable.  The Board erred by affirming the examiner's rejection based solely on such a statement of universal applicability of ABB Motor.  JA15.

"Obviousness requires *more* than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination."  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) (emphasis added) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)).  "Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements *in the normal course of research and development* to yield the claimed invention."  *Id.* (emphasis added).

As the Supreme Court emphasized in *KSR*, obviousness is a flexible inquiry, and there are a variety of ways to make the required showing. For example, "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR*, 550 U.S. at 421. Alternatively, the obviousness analysis could draw on sources of evidence such as the literal teachings of the prior art, or the "store of common knowledge" of those of ordinary skill in the art." *Unigene Labs*, 655 F.3d at 1361. But regardless of the form it takes, somehow, the explanation of obviousness must be not be "vague" but rather "collectively, although not explicitly, guide an artisan of ordinary skill towards a particular solution." *Id.*

Baldor's "universal applicability" premise, adopted by the examiner and the Board, does not pass muster under cases like *KSR* and *Unigene Labs*. This flawed premise traces its lineage from the Board's ruling (JA15-16) to the examiner's Right of Appeal Notice (JA2133) to Baldor's original request, which stated only the following, appropriately enough, in a footnote: "[ABB Motor] implicitly disclose[s] the use of the ABB drive system in a wet cooling tower application" (JA64 at n. 13). In that footnote, Baldor cited two statements in the record that the ABB DriveIT PM Motor "could be used in any application" either "up to about 850 r/min" or "where squirrel cage motors with a gearbox would normally be

45

used." JA190; JA259.  Baldor did not mention that immediately following the first statement, the reference added that "[h]owever, not all application may be economic."  JA190.  Nor did Baldor explain what a squirrel cage motor might be (JA259), what fan speeds are appropriate in for a cooling tower fan, or any other details about cooling towers that would allow one to assess — much less understand the motivation for — the prospect of using an ABB Motor in a cooling tower.  Nor did Baldor ever supplement this lack of evidence as the reexamination wore on, even though it presumably had great access to ABB information, because ABB owns Baldor.

The examiner never should have adopted Baldor's proposed rejection based on ABB Motor, because Baldor never proposed an acceptable reason why one of skill in the art would have tried to combine ABB Motor with a cooling tower — no market forces, no technical reasons, no economic reasons, no explanation of the possible options and likelihood of success.  If statements in catalogs that the products can be widely applied (which should be viewed with a skeptical eye in any event) are all it takes to make out a prima facie case of obviousness, then the guidelines imposed by *KSR* have no force at all.  All of the obviousness rejections at issue in this appeal should be reversed because there has never been a coherent basis for the proposed combinations.

### C.    All the Evidence Shows that One of Ordinary Skill Would Have Been Led Away from the Direct-Drive Permanent Magnet Motor in a Cooling Tower Proposed by Baldor and Adopted by the Examiner and Board

The Board compounded its error in accepting the obviousness rejections without evidence of a motivation to combine the references by rejecting the undisputed evidence that a person of ordinary skill would not have sought to combine ABB Motor with the cooling towers described in Smith or Hartman.  Mr. Rollins's declaration directly addressed numerous technical reasons why ABB permanent magnet motors would have been particularly unsuitable for use in a cooling tower.  Rather than credit this evidence as it should have, the Board discounted it because it viewed Prime Datum's claims as too broad and erroneously required Prime Datum to show that no cooling tower could possibly function with ABB Motor for any purpose.

### 1.    The Claims Are All Drawn to Cooling Towers with the Inventive Requirements

The Board erred when it accused Prime Datum of attempting to read limitations into its claims to support its nonobviousness arguments.  JA16-17. Every claim is limited to cooling towers, wet-cooling towers, drive systems for such cooling towers, or methods of replacing the fan drive systems in such cooling towers.  JA114-15.  Furthermore, every claim contains the basic requirements that define the invention, *inter alia*, a permanent magnet motor directly connected to a

fan in a cooling tower. *Id.* These claim requirements were the basis for Prime

Datum's evidence and arguments that a person of ordinary skill would not have

looked to incorporate a permanent magnet motor from ABB Motor into a cooling

tower in a direct drive configuration.

> **2.      The Board Should Have Credited Prime Datum's
>           Unrebutted Evidence that One of Ordinary Skill
>           Would Not Have Been Led to Use ABB Motors for
>           Direct Drive in a Cooling Tower Application**

Notwithstanding the examiner's adoption of Baldor's obviousness

combinations in the absence of any defined reason to make the combination, Prime

Datum provided detailed evidence that the combination would not have been

obvious. The Board's reasons for discounting this evidence were legally incorrect,

and there was no contrary record evidence for the Board to rely upon.

As evidence for why a person of ordinary skill *would* make a particular

combination is crucial to obviousness, so too is evidence that such a person *would*

*not* make that combination. While not necessarily determinative, evidence of

teaching away is "a significant factor" to be considered, and it is a "useful general

rule" "that a reference that teaches away cannot serve to create a prima facie case

of obviousness." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). "If references

taken in combination would produce a 'seemingly inoperative device,' we have

held that such references teach away from the combination and thus cannot serve

as predicates for a prima facie case of obviousness." *McGinley v. Franklin Sports,*

*Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) (quoting *In re Sponnoble*, 405 F.2d 578, 587 (C.C.P.A. 1969) (references teach away from combination if combination produces seemingly inoperative device); *see also In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (inoperative modification teaches away); *In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959) (combinations that change the "basic principles under which the [prior art] was designed to operate," do not support obviousness).

Prime Datum squarely rebutted Baldor's proposed combination — adopted by the examiner and Board, and now on appeal — with specific evidence explaining why that particular combination was remarkably unlikely.  JA2232-41.  Prime Datum focused its evidence on what Baldor offered: the combination of the cooling tower in Smith or Hartman with ABB Motor, as well as other ABB components and other references.  With the declarations of Mr. Rollins (JA1906-08 at ¶¶ 24-31), Dr. Hanselman, (JA1879-80 at ¶¶ 3& 5) and related exhibits and documents, Prime Datum showed that ABB Motor had numerous drawbacks that would have made it unsuitable in a cooling tower application.  The ABB motors were, *inter alia*, (i) too weak to replace existing gearboxes; (i) too long to occupy the space occupied by existing gearboxes, (ii) far too heavy to be mounted on a fan deck, (iii) were only disclosed in vertical shaft-*down* orientations, and (iv) were not disclosed to be usable with significant axial, radial, and yaw loads such as the weight of a cooling tower fan or the thrust created by the fan.  JA1907-08 at ¶ 30;

JA2232-41.  Thus, Prime Datum showed that the proposed combination was not operative for its intended purpose: improving on the indirect, gearbox-driven cooling tower drive systems.  JA2232-41.

The Board rejected Prime Datum's evidence for three invalid reasons.  First, the Board held that Prime Datum could not rely on its evidence because the 028 Patent's cooling tower claims did not "necessarily constrain[] the obviousness analysis to the full range of design considerations specific to [Prime Datum's] particular problem."  JA16.  In other words, the Board would only accept, e.g., the argument that the ABB motors were too heavy for the fan deck, if the claims contained a limitation on the weight of the motor.   Unsurprisingly, the Board cited no law whatsoever for this odd proposition.  Once an obviousness combination is established that meets the claim limitations, the question becomes simply whether one of ordinary skill in the art would have found *that combination* obvious.  If *that combination* was undesirable or inoperative for various reasons, then the skilled artisan would not have sought the combination.  This analysis simply has nothing to do with whether the claims are limited to the particular reasons why the skilled artist would have eschewed the proposed obviousness combination.  The Board erred by requiring otherwise.

Second, the Board held that Prime Datum's evidence was incomplete because it focused only on ABB Motor and its application in cooling towers.  The

Board was not persuaded that "ABB Motor would have discouraged one skilled in the art from attempting to use permanent magnet motors in ***all*** wet cooling tower applications."  JA15-16 (emphasis added).  This reasoning fails at the start, because Prime Datum was only presented with the rejection proposed by Baldor and adopted by the examiner, which was the combination of ABB Motor with the cooling towers set out in Smith or Hartman.  And Prime Datum, through the declarations and other evidence, rebutted specifically that combination.  The Board cannot require Prime Datum to rebut the obviousness of combinations that it has not been presented with, and certainly not every possible combination for "all" wet cooling tower applications.

In a similar vein, the Board held that Prime Datum failed to show that one skilled in the art would not have had a "reasonable expectation" of success when combining ABB Motor with other references, because Prime Datum's evidence with regard to the drive was focused on combining the ACS800 drive with a beta-test motor designed by Mr. Rollins and his team.  JA17.  But the Board appears to entirely miss the point that Mr. Rollins's testimony focused first on the lack of a "reasonable expectation" of success of the ABB Motor.  JA1906-8 at ¶¶ 24-31.  That alone is powerful evidence of nonobviousness.  And, having established that he had created his own motor for use in the invention, Mr. Rollins went on to prove evidence that even if one of ordinary skill in the art had done the same, he

still would have had been led away from incorporating the ACS800 drive, *which was the drive in the obviousness rejection*. JA1909-10 at ¶ 35. The examiner proposed no drive *other* than the ACS800 (*see e.g.* JA2133), so Prime Datum's evidence — that ABB Motor was unsuitable, and even if a suitable motor were provided, ACS800 was unsuitable — directly rebutted the proposed obviousness combination.

Third, the Board considered but discounted Prime Datum's arguments that the references failed to teach the claimed connection between the motor's rotatable shaft and the fan hub. The Board held that "[o]ne cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references." JA18. This proposition is wrong on its face, because a crucial part of an obviousness analysis is the teaching of each individual reference. But the Board's sentiment — that a claim limitation can be met by a combination of references — would be perfectly reasonable if the rejection at issue had actually proposed a way that the combination of references would meet the shaft connection limitations. But the rejection did not do so. Instead, the Board suggested that the connection was "inherent," but made no effort whatever to explain how the ABB Motor reference could reach the high bar of inherency, or how it was that a person of ordinary skill in the art could have been expected to recognize and learn from something "inherent." JA18. The Board also stated that

52

Smith and Hartman "at least suggest" the connection, but not only are the diagrams and descriptions of Smith and Hartman woefully incomplete on this point, mere "suggestion" cannot prevail against the detailed, fact-based evidence provided by Prime Datum that one of ordinary skill would not have sought to connect an ABB motor to a cooling tower fan.  JA18-19.

The Board's bases for rejecting Prime Datum's unrebutted evidence of teaching away were legally flawed, and accordingly, the obviousness rejections should all be reversed.

### D.    The Method of Installing a New Fan Drive Claims Particularly Highlight the Nonobviousness of the Invention over the ABB References

The Board's reasons for discrediting Prime Datum's evidence that one of ordinary skill would not have sought to use ABB Motor with existing cooling towers ring especially hollow in view of claim 5 and the other claims directed to methods of replacing the drive system in wet-cooling towers.  The Board asserted that the claims lacked sufficient limitations to exclude the possibility that a person of ordinary skill would have used an ABB motor in a cooling tower for applications or purposes other than those set out by Mr. Rollins in his declaration. JA15-17.  But claim 5 tracks precisely on Mr. Rollins's narrative, because it claims starting with an existing prior art wet-cooling tower, removing the gearbox, drive shaft, and induction motion, and replacing it with a direct-drive, permanent magnet

53

motor with axial bearings to support the weight of the fan in a vertical orientation. JA114.  When viewed in light of claims 5-8, the Board's reasoning is even more specious, and the obviousness rejection on claims 5-8 should be reversed for this independent reason.

### E.    The Claims Requiring an Air-Flow Sensor Feedback Loop Particularly Highlight the Nonobviousness of the Invention over the ABB References and Facão

The Board affirmed the rejection of claims 9, 11, 12, 14-22, and 24 in view of combinations involving Facão with little comment, relying on the reasons stated by Baldor.  JA20.  Neither the Board (JA20) nor Baldor (JA2291) disputed that these claims require a feedback loop from an air-flow sensor to the fan drive to control fan speed.  And neither the Board nor Baldor disputed that Facão fails to disclose such a control loop.  JA20; JA2091.  Rather, Facão discloses only monitoring the air flow to study performance of the tower (JA164), and ACS800 discloses only accepting inputs (JA79).  Tracing back to its original proposed rejections, Baldor never supplied a teaching of the complete control loop, from the air sensor to the controller, and never supplied a reason why one of skill in the art would have modified Facão and the ACS800 to create the claimed control loop. JA21; *see also* JA79-80.  Thus, the obviousness rejections on claims 9, 11, 12, 14-22, and 24 should be reversed for this independent reason.

## III.    Claims 12-22 and 24 Do Not Lack Enablement

The Board mistakenly converted Prime Datum's argument that it would not have been obvious to use the ABB ACS-800 Drive for the claimed invention into a rejection of claims 12-22 and 24 for lack of enablement.  The Board's theory was that, because one particular drive (the ABB ACS-800) required significant effort to adapt to a particular suitable motor (Mr. Rollins's beta-test motor), one of ordinary skill in the art could not have adapted *any* drive to work with *any* suitable motor.  JA12.  This was error.

As this Court has explained, "a specification disclosure which contains a teaching of the manner and process of making and using the invention in terms which correspond to those used in describing and defining the subject matter sought to be patented must be taken as in compliance with the enabling requirement of the first paragraph of §112 unless there is reason to doubt the objective truth of the statements contained therein which must be relied on for enabling support."  *In re Brana*, 51 F.3d 1560, 1566 (Fed. Cir. 1995) (*quoting In re Marzocchi*, 439 F.2d 220, 223 (C.C.P.A. 1971)) (emphases in original).  Thus, "[w]hen rejecting a claim under the enablement requirement of section 112, the PTO bears an initial burden of setting forth a reasonable explanation as to why it believes that the scope of protection provided by that claim is not adequately

enabled by the description of the invention provided in the specification of the application . . . ." *In re Wright*, 999 F.2d 1557, 1561-62 (Fed. Cir. 1993).

Under this standard, the enablement rejection was improper because (i) it relied on a single embodiment, thus wrongly equating obviousness and enablement, and (ii) it failed to recognize that the invention of the 028 patent lies in the combination of limitations, not in the implementation of one particular limitation.

### A. Mr. Rollins's Testimony about the Difficulties in Adapting the ABB ACS-800 Drive Cannot form the Basis of an Enablement Rejection Because It Refers to Just One Embodiment

Mr. Rollins provided his declaration in response to rejections over proposed combinations of prior art involving the ABB ACS-800 Drive. *See e.g.* JA62-63. Those rejections postulated that it would have been obvious to start with a cooling tower (as in Smith or Hartman) and incorporate an ABB Motor as well as an ABB ACS-800 drive. *Id.* As described above, Mr. Rollins provided evidence that the ABB Motors were not suitable for use in cooling towers. JA1906-08 at ¶¶ 24-31. Mr. Rollins further explained that in his experience "the ACS800 Drive was not readily combinable" with a beta-test motor that his team had built after rejecting ABB's motors. JA1909-10 at ¶ 35. This evidence squarely addressed the question of whether a person of ordinary skill would have found it obvious to use an ACS800 drive with a motor suitable for use in a cooling tower, because

obviousness requires showing only one obvious combination that falls within the claims, and that proposed combination can be rebutted by showing that it is "inoperable for its intended purpose." *Gordon*, 733 F.2d at 902.

However, this same evidence is not an adequate foundation for an enablement rejection, which requires more than showing one embodiment is inoperative. "Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984). "It is not a function of the claims to specifically exclude possible inoperative" embodiments. *Id.* In *Atlas Powder*, the Court agreed that claims were enabled even though 40 percent of the experiments filed by the patent owner before filing the patent application reached non-optimal results. *Id.* at 1577. The enablement challenged failed because there was an insufficient showing that so many embodiments were inoperative that it "in effect forces one of ordinary skill in the art to experiment unduly in order to practice the claimed invention." *Id.* at 1576-77.

So too here, as in *Atlas Powder*, Baldor never showed, and there is no evidence in the record to support, that more than at most a single embodiment was inoperative: the ACS800 Drive in combination with the beta-test motor described by Mr. Rollins. The enablement rejection cannot be based on this single example, entered into the record to rebut a particular combination proposed as a basis for

obviousness.  To do so assumes — with no foundation in the record —that the only way to implement the claimed invention was via the unsuitable ACS800 drive. Instead, the examiner was obligated to show why the 028 patent lacked "a description that enables one skilled in the art to make and use the claimed invention." *Atlas Powder*, 750 F.2d at 1576.  The enablement rejection should be reversed because the record is void of the necessary evidence under this standard.

**B.     There Is No Evidence that One of Ordinary Skill Would Have Needed to Unduly Experiment to Practice the Claimed Invention Once Provided with Prime Datum's 028 Patent**

Regardless of Mr. Rollins's testimony, claims 12-22 and 24 do not lack enablement simply because the specification of the 028 Patent stops short of providing detailed specifications for a motor and driver for use in the claimed invention.  There is no evidence that the level of detail provided in the 028 Patent was insufficient to have given a person of ordinary skill in the art — who has the 028 patent in hand, and has knowledge of prior art gearboxes and the loads the gearboxes were exposed to — the necessary foundation to make and use the invention without undue experimentation.

"[A] patent does not need to guarantee that the invention works for a claim to be enabled.  It is well settled that an invention may be patented before it is actually reduced to practice.  Similarly, a patentee is not required to provide actual working examples . . . ."  *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180,

1189-90 (Fed. Cir. 2014).  Indeed, the specification preferably omits aspects of the design that are known in the art.  *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986).  Thus, to reject the claims here, the examiner had the burden of showing that experimentation would have been required *after* the person of ordinary skill in the art has the 028 Patent available to her.  *Alcon*, 745 F.3d at 1189-90.

For all the reasons explained above in Section II(C), a person of ordinary skill in the art would not have looked to the ABB Motors and ACS800 drive for use in a cooling tower.  But once in possession of the idea to do that in spite of the reasons against it — in other words, once in possession of the 028 Patent — it would have been straightforward to design the necessary components.  A person of ordinary skill in the art, possessing the 028 Patent, would not be constrained to using the unsuitable ACS800 drive, but would instead have the whole field as well as her own faculties at her disposal.  And there is no evidence in the record to support the idea that the person of ordinary skill would have been unable to make and use the invention under that correct standard.

## IV.    Prime Datum Is Entitled to Claim Direct-Drive Permanent Magnet Motors in Cooling Towers Broadly, Without Limiting the Claims to Particular Embodiments

Baldor's proposed rejections, Prime Datum's rebuttal based on the unsuitability of Baldor's proposed combinations, and the ultimate Board decision

on obviousness and enablement are connected by an underlying question: on this record, should Prime Datum be entitled to its broad claims on direct-drive permanent magnet motors in cooling towers?  Baldor would say no, because Prime Datum failed to narrow its claims to cover the specific implementation of the cooling tower that overcame all the problems outlined by Mr. Rollins in his declaration, and because the 028 Patent does not contain enough disclosure of Prime Datum's particular design.  Baldor is wrong, and in essence its entire theory of unpatentability misses the point of the invention in the 028 Patent.

Prior to the invention of the 028 Patent, there were no cooling towers with permanent magnet motors in a direct drive configuration.  This is true, even though, as Baldor has asserted throughout this proceeding, ABB had available for purchase permanent magnet motors for what ABB claimed was a wide variety of applications.  As Prime Datum has shown, the ABB motors were so unsuitable for use in cooling towers that a skilled artisan would not have considered using ABB's equipment in a cooling tower.  Skilled artisans would have been focusing their attention elsewhere, such as on the gearbox, as Mr. Rollins testified.  Nonetheless, Mr. Rollins and his team determined that the best way to improve existing cooling towers was to eliminate the gearbox and replace it with a permanent magnet motor in direct drive.  JA1901 at ¶ 12.  Having made this unconventional determination, and describing in the 028 Patent how such a cooling tower would fit together and

function, the remainder of the implementation was straightforward for skilled artisans.

Fundamentally, this is why Prime Datum deserves its broad claims on its new idea. No one else overcame the prevailing wisdom and recognized that cooling towers could be improved in the way Prime Datum proposed. Prime Datum should not have to show that there was no permanent magnet motor on earth and no cooling tower on earth that could possibly be combined to produce a functioning fan drive, regardless of how useless or commercially ineffective such a combination would be. Aside from being impossible, this task is legally irrelevant. Baldor proposed a specific combination of specific prior art, and Prime Datum showed why it would have been of no interest to skilled artisans. Prime Datum's rebuttal of Baldor's arguments is especially substantial because no party in the world could have presented an ABB-based combination better than Baldor — ABB owns Baldor.

The *Sponnoble* case is a pithy example of the principles that should assure Prime Datum protection for its invention. 405 F.2d at 579-87. In *Sponnoble,* the Court considered a claim on a pharmaceutical package consisting of a two-chamber glass vial that would allow two parts of a pharmaceutical to be isolated until such time as mixing would be appropriate. The claim provided for a silicone-coated butyl rubber plug in a narrow neck between the two chambers that could be

moved with a piston out of the neck such that the contents of the two chambers could then mix together.  The prior art provided for essentially the same types of devices, but with natural rubber plugs that were subject to leakage, as well as teachings that butyl rubber had impervious properties and that silicone had lubricating properties.  Whereas the focus of prior artisans was to improve the rubber plug by making it large and more elastic, Sponnoble realized that the leakage was not around the seal, but through it, and thus Sponnoble recognized that a better solution would be to change the material to silicone-coated butyl rubber, which would both act as a barrier and slide in the neck.

As the Court explained, having made his realization, implementation was of no moment, because "a patentable invention may lie in the discovery of the source of a problem even though the remedy may be obvious once the source of the problem is identified."  *Id.* at 585.  The Court went on to analyze the prior art, analyzing each reference individually and in combination to show that the combination would not have worked for its intended purpose, and that the prior art failed to focus and recognize the problem of seepage *through* the rubber plug.  *Id.* at 587.  And nowhere did the Court require Sponnoble's claims to be limited to a specific embodiment that captured the flaws with the prior art combination, because the focus was on what would happen if the prior art were put together per the rejection; not whether the disadvantages of the prior art combination were in

the claim.  Nor did the Court require Sponnoble to show that the prior art could not be combined to form a two-chamber vessel for some other purpose than keeping the pharmaceuticals separate, or doing so less successfully.  Nor were Sponnoble's claims rejected as lacking enablement because they covered the inoperative embodiments in the proposed prior art combinations.

So too here, as in *Sponnoble*, the inventors should be entitled to claims covering the full scope of their invention, which recognized a problem with cooling towers that had not received the attention of skilled artisans, provided a solution that had never before been achieved, and flew in the face of the conventional wisdom at the time.

## CONCLUSION

For the reasons stated, Prime Datum respectfully requests that this Court reverse the Board's decision.

Date: March 21, 2016

/s/ Joseph Lucci
Joseph Lucci
John Frank Murphy
BAKER & HOSTETLER LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104
(215) 568-3100

**ADDENDUM**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,286 | 09/14/2012 | 8111028 | 2021_001 | 6583 |

15204        7590        06/29/2015
Harris Beach/Syracuse
333 West Washington Street
Suite 200
Syracuse, NY 13202

| EXAMINER | |
|---|---|
| MENEFEE, JAMES A | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/29/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BALDOR ELECTRIC COMPANY
Requester, Respondent, and Cross-Appellant

v.

PRIME DATUM, INC.
Patent Owner, Appellant, and Cross-Respondent

_____

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2
Technology Center 3900

_____

Before DENISE M. POTHIER, ANDREW J. DILLON, and
IRVIN E. BRANCH, *Administrative Patent Judges*.

BRANCH, *Administrative Patent Judge.*


DECISION ON APPEAL

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

## BACKGROUND

Third Party Requester, Baldor Electric Company ("Requester"), filed a Request for *Inter Partes* Reexamination ("Request") of United States Patent 8,111,028 (hereinafter the "'028 patent")[1] on September 14, 2012. The '028 patent includes claims 1–11. During reexamination, the Examiner rejected original claims 1–11 and rejected new claims 12–24, which Patent Owner added by amendment. *See* PO Resp. and Amend., Feb. 11, 2013, 5–9.

Patent Owner, Prime Datum, Inc. ("Patent Owner"), appeals under 35 U.S.C. §§ 134 and 315 the Examiner's decision to reject claims 1–22 and 24. PO App. Br. 7–30.[2] Requester appeals under 35 U.S.C. §§ 134 and 315 the Examiner's decision not to reject claims 1–22 and 24 on different grounds. TPR App. Br. 6–14. The Examiner's rejection of new claim 23 is not on appeal. An oral hearing was conducted on May 13, 2015.[3]

We have jurisdiction under 35 U.S.C. §§ 134 and 315. We affirm the Examiner's decision to reject claims 1–22 and 24.

---

[1]    The '028 patent issued to Rollins, et al., on February 7, 2012, from Application 12/524,198 having a PCT filing date of September 23, 2008.

[2]    Throughout this opinion, we refer to (1) the Right of Appeal Notice mailed September 13, 2013 ("RAN"); (2) Patent Owner's Appeal Brief filed March 3, 2014 ("PO App. Br."); (3) Requester's Respondent Brief filed March 4, 2014 ("TPR Resp. Br."); (4) the Examiner's Answer mailed April 1, 2014 ("Ans.") (incorporating the RAN by reference); (5) Requester's Appeal Brief filed February 4, 2014 ("TPR App. Br."); (6) Patent Owner Respondent's Brief filed March 4, 2104 ("PO Resp. Br."); Patent Owner's Rebuttal Brief filed May 1, 2014 ("PO Reb. Br."); and Action Closing Prosecution mailed April 24, 2013 ("ACP").

[3] A transcript of the oral argument will be added to the record in due course.

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

## RELATED PROCEEDINGS

We are informed of no proceedings related to this appeal.

## STATEMENT OF THE INVENTION

The '028 patent describes an integrated fan drive for a cooling tower. The drive includes a high torque, low speed permanent magnet motor, and a variable frequency drive. *See generally* '028 patent, Abstract.

Claim 1 is illustrative:

> 1.    A drive system for driving a fan in a cooling tower, the fan comprising a fan hub and fan blades attached to the fan hub, the drive system comprising:
> a high-torque, low speed permanent magnet motor comprising a motor casing, a stator and a rotatable shaft, the rotatable shaft being configured for connection to the fan hub, the motor further comprising a dual bearing system consisting of a pair of radial bearings that locate and support the rotatable shaft relative to the motor casing; and
> a variable frequency drive device to generate electrical signals that effect rotation of the rotatable shaft of the motor at a rotational speed in order to rotate the fan.

## EVIDENCE RELIED ON

| | | |
|---|---|---|
| Schwedler et al. (hereinafter "Schwedler") | US 5,600,960 | Feb. 11, 1997 |
| Hartman | US 6,257,007 | July 10, 2001 |
| Discenzo et al. (hereinafter "Discenzo") | US 7,949,483 | May 24, 2011 |
| Rollins et al. (hereinafter "APA")[4] | US 8,111,082 | Feb. 7, 2012 |

---

[4] APA stands for Admitted Prior Art.

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

Applegate          US 2006/0197394        Sept. 7, 2006

Facão et al., *Thermal Behaviour of Closed Wet Cooling Towers For User With Chilled Ceilings*, Applied Thermal Engineering 20 pp. 1225–1236 (2000) (hereinafter "Facão").

Smith, *Variable Frequency Drives & Cooling Towers*, Joliet Technologies, http://www.joliettech.com/variable-frequency-drives_and_cooling-towers.htm (last visit May 27, 2015).

ABB Catalogue GB-05-2004, *DriveIT Permandent Magnet Motors* (hereinafter "ABB Motor").

ABB Technical Note, *Drive IT Low Voltage Permanent Magnet Motors for Low Speed Applications,* TM13 EN REVB (2003) (hereinafter "ABB Motor").

Ikaheimo, *Permanent Magnet Motors Eliminate Gearboxes,* ABB Review, pp.22–25 (2002) (hereinafter "ABB Motor").

Ikaheimo, *New Roles for Permanent Magnet Technology,* ABB Review Special Report, pp. 37–40 (2004) (hereinafter "ABB Motor").[5]

ABB Review, *Compact and Complete, DriveIT Low Voltage AC Drive, ACS 800*, pp. 16–21 (Apr. 2002) (hereinafter "ACS 800").

Firmware Manual, *IGBT Supply Control Program 7.x,* No. 3AFE68315735 REV C (Mar. 28, 2006) (hereinafter "ACS 800").

Supplemental to Firmware Manuel for ACS800 Standard Application Program 7.x, *Permanent Magnet Synchronous Machine Drive Application*

---

[5] The above four citations are Exhibits 9A-D and are called collectively ABB Motor.  Ans. 2.

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

*Program,* No. 3AFE68437890 REV B (Jan. 19, 2005) (hereinafter "ACS 800").

Firmware Manual, *ACS 800 Pump and Fan Control (PFC) Application Program 7.x,* No. 3AFE64649337 REV A (July 22, 2002) (hereinafter "ACS 800")

Hardware Manual, *ACS800-02 Drives (45 to 560 kW) ACS800-U2 Drives (60 to 600 HP),* No. 3AFE64567373 REV F (Aug. 8, 2007) (hereinafter "ACS 800").[6]

Specification Sheet, *ControlIT AC 800C Controller the Compact and Cost-effective Process Controller* (2002) (hereinafter "AC800 Controller").

Product Brochure, *ControlIT Control Software and Tools for AC 800m and AC 800C With Everything You Need to Keep Production at Peak Level* (2002) (hereinafter "AC800 Controller").

Data Sheet, *ControlIT Control Software and Tools for AC 800m and AC 800C* (2004) (hereinafter "AC800 Controller").

Product Guide, *Industrial Compact Control Builder AC 800M Version 5.0 Product Guide* (June 2006) (hereinafter "AC800 Controller").

User Guide, *Industrial IT Compact Control Builder AC 800 M Version 5.0 Basic Control Software Introduction and Configuration* (June 2006) (hereinafter "AC800 Controller").

Data Sheet, *S200 I/O Systems Units* (May 2002) (hereinafter "AC800 Controller").

---

[6] The above five citations are Exhibits 10A-E and are called collectively ACS800.  Ans. 3

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

Manuel, *IndustrialIT Compact Control Builder AC 800M Version 5.0 Extended Control Software Binary and Analog Handling* (June 2006) (hereinafter "AC800 Controller").[7]

## THE REJECTIONS AND PROPOSED REJECTIONS

Patent Owner Appeals the Examiner rejecting the claims as follows:

1)      Claims 12–22 and 24 under 35 U.S.C. § 112(a) or 35 U.S.C. § 112 (pre-AIA), first paragraph, for failing to comply with the enablement requirement because the claims contains subject matter which was not described in the specification in such a way as to enable one skilled in the art to which it pertains, or with which it is most nearly connected, to make and/or use the invention.  RAN 8–9.

2)      Claims 1–3 and 10 under 35 U.S.C. § 103(a) as unpatentable over Smith, ABB Motor, and ACS800.  *Id.* at 11.

3)      Claims 5–7 under 35 U.S.C. § 103(a) as unpatentable over APA, ABB Motor, and Smith.  *Id.* at 12.

4)      Claim 8 under 35 U.S.C. § 103(a) as unpatentable over APA, ABB Motor, Smith, and ACS800.  *Id.*

5)      Claim 4 under 35 U.S.C. § 103(a) as unpatentable over Smith, ABB Motor, ACS800, and AC800 Controller.  *Id*.

6)      Claims 9 and 11 under 35 U.S.C. § 103(a) as unpatentable over Smith, ABB Motor, ACS800, and Facão.  *Id*.

---

[7] The above seven citations are Exhibits 11A-G and are called collectively ACS800 Controller.  Ans. 3

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

7)    Claims 1–3 and 10 under 35 U.S.C. § 103(a) as unpatentable over Hartman, ABB Motor, and ACS800.  *Id.* at 12–13.

8)    Claims 5–7 under 35 U.S.C. § 103(a) as unpatentable over APA, ABB Motor, and Hartman.  *Id.* at 13.

9)    Claim 8 under 35 U.S.C. § 103(a) as unpatentable over APA, ABB Motor, Hartman, and ACS800.  *Id.*

10)    Claim 4 under 35 U.S.C. § 103(a) as unpatentable over Hartman, ABB Motor, ACS800, and AC800 Controller.  *Id.*

11)    Claim 9 under 35 U.S.C. § 103(a) as unpatentable over Hartman, ABB Motor, ACS800, Facão, and Schwedler.  *Id.*

12)    Claim 11 under 35 U.S.C. § 103(a) unpatentable over Hartman, ABB Motor, ACS800, and Facão.  *Id.* at 14.

13)    Claims 12 and 14–24 under 35 U.S.C. § 103(a) as unpatentable over Smith, ABB Motor, ACS800, AC800 Controller, and Facão.  *Id.* at 14–19.

14)    Claims 12 and 14–24 under 35 U.S.C. § 103(a) as unpatentable over Hartman, ABB Motor, ACS800, AC800 Controller, Facão and Schwedler.  *Id.* at 19–23.

Requester appeals the Examiner not rejecting the claims as follows:

A)    Claims 1–22 and 24 under 35 U.S.C. § 112(a) or 35 U.S.C. § 112 (pre-AIA), first paragraph, for failing to describe the best mode contemplated by the inventors.  RAN 7–8.

B)    Claims 1, 2, 5, 8, and 10 under 35 U.S.C. § 102(b) as anticipated by Applegate.  *Id.* at 10.

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

C)    Claims 3, 4, 6, and 7 under 35 U.S.C. § 103(a) as unpatentable over Applegate and Discenzo.  *Id.*

D)    Claim 9 under 35 U.S.C. § 103(a) as unpatentable over Applegate, Discenzo, Facão, and Schwedler.  *Id.*

E)    Claim 11 under 35 U.S.C. § 103(a) as unpatentable over Applegate, Discenzo, and Facão.  *Id.* at 11.

F)    Claims 12–22 and 24 under 35 U.S.C. § 103(a) as unpatentable over Applegate, Discenzo, Facão, and Schwedler.  *Id.* at 14.

G)    Claim 13 under 35 U.S.C. § 103(a) as unpatentable over Smith, ABB Motor, ACS800, AC800 Controller, and Facão.  *Id.* 14, 17.


THE NON-ENABLEMENT REJECTION

The Examiner rejected new claims 12–22 and 24, finding that, in view of Patent Owner's statement that undue experimentation was required to make changes so that known parts would work in the invention (Rollins Decl.[8] ¶¶ 35–38), Patent Owner's failure to describe the steps in the undue experimentation render claims 12–22 and 24 non-enabled.  RAN 8–9. Patent Owner argues that "Patent Owner's explanation of shortcomings of the particular references cited by Requestor and adopted by the Examiner, which shortcomings made them non-obvious to combine, is not an admission that undue experimentation was required once one read the disclosure in the '028 Patent."  PO App. Br. 9–10.  Patent Owner asserts that "[o]nly routine selection or design of components was necessary once one learned, from the disclosure in the '028 Patent, of the use of a high-torque,

---

[8] Declaration of Patrick Rollins Under 37 CFR § 1.132, dated Feb. 11, 2013.

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

low speed permanent magnet motor adapted to directly drive a cooling tower fan, with the motor mounted within a wet cooling tower." *Id.* at 10; *see also* PO Reb. Br. 11–13.

Patent Owner's argument raises the following issue:

Under 35 U.S.C. § 112, first paragraph, did the Examiner provide a reasonable basis, that has not been overcome sufficiently, for determining that the full scope of new claims 12–22 and 24 is not enabled adequately by the Specification of the '028 patent?

We are unpersuaded of error in the Examiner's rejection. "Although not explicitly stated in section 112, to be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993) (internal citations omitted).

> When rejecting a claim under the enablement requirement of section 112, the PTO bears an initial burden of setting forth a reasonable explanation as to why it believes that the scope of protection provided by that claim is not adequately enabled by the description of the invention provided in the specification of the application . . . .  If the PTO meets this burden, the burden then shifts to the applicant to provide suitable proofs indicating that the specification is indeed enabling.

*Wright,* 999 F.2d at 1561–62 (internal citation omitted).

Here, Rollins, the inventor of the '028 patent, testified as follows:

> Once we created a prototype permanent magnet motor ("the beta-test motor") meeting all of our design criteria, we tried using the ABB ACS-800 VFD [Variable Frequency Drive] to

9

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

> drive the beta-test motor as now suggested in the Request.
> However, our experience indicated that the ACS800 Drive was
> not readily combinable with a permanent magnet motor. We
> experienced several problems with the ACS-800, specifically:
> the switching frequency of the drive <u>required us to unduly
> experiment</u> to mitigate the voltage spikes created by the ACS-
> 800. Ultimately, we had to insert a load reactor into the
> ACS800 Drive to resolve the problems. Despite the fact that
> ABB instructed us that a load reactor was not necessary, after
> several weeks of experimentation, we found a workable
> solution using a load reactor.

Rollins Decl. ¶ 35 (emphasis added). Hence, because Patent Owner stated

that undue experimentation was required, at least to "mitigate the voltage

spikes" created by the drive's switching frequency, we find the Examiner

met the burden of putting forth a reasonable explanation why "the scope of

protection provided by that claim is not adequately enabled by the

description of the invention provided in the specification of the application."

*Wright,* 999 F.2d at 1561–62. Specifically, the rejected independent claims

recite both "a variable frequency drive device" and a "permanent magnet

motor," but the '028 Patent does not explain the selection criteria for a

variable frequency drive and/or selection criteria for a permanent magnet

motor usable with the selected variable frequency drive so as to avoid the

undue experimentation necessary to "mitigate the voltage spikes."

Further, while we note that our reviewing court has outlined "undue

experimentation" factors to be considered when evaluating whether a

disclosure is enabling (*see In re Wands,* 858 F.2d 731, 737 (Fed. Cir. 1988)),

we agree with the Examiner (ACP 6) that the inventor's admission of undue

experimentation is sufficient, at least for shifting the burden to Patent Owner

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

"to provide suitable proofs indicating that the specification is indeed enabling." *Wright,* 999 F.2d at 1561–62.

Patent Owner argues that "there is simply no evidence in the record that a VFD made by anyone other than ABB would necessitate undue experimentation." PO App. Br. at 9. This argument, however, is unavailing because it is not supported by sufficient persuasive evidence that, after reading the disclosure of the '028 patent, one skilled in the art would be able to avoid the admitted undue experimentation that would flow from selecting an unworkable VFD such as the ACS800 VFD. We disagree with Patent Owner that the inventor's having encountered problems that resulted in undue experimentation specific to the ACS800 VFD "does not mean that the disclosure of the '028 Patent was insufficient, or that it would lead to *undue* experimentation, simply because it failed to warn away from use of the ACS800 VFD." *Id.* To the contrary, in this case, the failure to warn (i.e., the failure to provide sufficient selection criteria to enable one skilled in the art to avoid selecting an unworkable VFD), absent guidance to, for example, what sort of VFD would work, leads directly into the situation that requires undue experimentation. We do not otherwise find "suitable proofs indicating that the specification is indeed enabling," (*Wright,* 999 F.2d at 1561–62) at least with respect to this specific technical hurdle. As such, Patent Owner has not overcome the Examiner's reasoning that the Specification is non-enabling for the full scope of claims 12–22 and 24.

Because the Examiner reasonably determined, based on the inventor's testimony, that the Specification failed to enable the new claims, and because Patent Owner failed to put forth sufficient, persuasive, and contrary

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

evidence, on the record before us, the Examiner did not err in rejecting claims 12–22 and 24 as unpatentable under 35 U.S.C. § 112 for failing to comply with the enablement requirement.

## THE ART REJECTIONS

Patent Owner first argues that it has been prejudiced because the rejections fail to specify in reasonable detail where teachings are purportedly found in the cited references.  PO App. Br. 10–12.  Patent Owner argues that the Request's failing to specify particular motors from ABB Motors, the Request's "cherry pick[ing] some aspects of the motor designs without reference to any particular motor," and "The Order Granting Reexamination Request adopt[ing] the proposed rejections without providing any further specificity," "deprived Patent Owner of an opportunity to propose new claims in light of, or offer amendments to avoid, Requestor's proposed specific combinations before prosecution was closed."  *Id.* at 10–11 (citing Request 29, 33; Order 8–9).

The issue raised by these arguments is not properly before us.  Such matters are to be addressed via petition.  37 C.F.R. § 1.181.  To the extent Patent Owner argues specific shortcomings in the pending rejections, we address those arguments *infra*.

Patent Owner also argues that the Examiner erred by improperly combining the teachings of ABB Motor, Hartman, Smith, and/or Facão for various reasons.  PO App. Br. 10–21, 23–24, 27–30; PO Reb. Br. 4–11.  Patent Owner also argues (1) that ABB does not teach or suggest "the rotatable shaft being configured for connection to the fan hub" (PO App. Br.

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

21–23), (2) that Hartman does not teach or suggest a motor directly driving a cooling tower fan, a motor shaft connect to a fan hub, or a permanent magnet motor mounted within a cooling tower (*id.* at 24–27), (3) that Smith does not teach or suggest a permanent magnet motor, locating a motor within a cooling tower, monitoring a cooling tower air flow to implement a closed-loop control system, or replacement of a gearbox with a motor that directly drives a cooling tower fan (*id.* at 27–28), and (4) that Facão does not teach or suggest closed loop control of a motor speed based on feedback from an airflow sensor (*id.* at 28–30).

Patent Owner's argument raises the following issues:

Under 35 U.S.C. § 103:

1)    Did the Examiner err by finding that:

a)    ABB Motor teaches or suggests a rotatable shaft configured for connection to a fan hub;

b)    Hartman teaches or suggests a motor directly driving a cooling tower fan, a motor shaft connected to a fan hub, and a permanent magnet motor mounted within a cooling tower;

c)    Smith teaches a permanent magnet motor, locating a motor within a cooling tower, monitoring a cooling tower air flow to implement a closed-loop control system, and replacement of a gearbox with a motor that directly drives a cooling tower fan; and

d)    Facão teaches closed loop control of a motor speed based on feedback from an airflow sensor;

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

2)    Is the Examiner's reason to combine the teachings of the cited

references supported by articulated reasoning with some rational

underpinning to justify the Examiner's obviousness conclusion?

*Rejections Over ABB Motor*

Patent Owner argues the Examiner erred in rejecting all claims as

obvious over ABB Motor because the motors disclosed in ABB Motor are

not suitable for wet cooling tower applications due to height and weight

constraints, inadaptability for driving a cooling tower fan, low torque,

loading limitations, and the like.  PO App. Br. 12–20.  All pending

obviousness rejections include ABB Motor.  Rejections 2–14 *supra*.

Patent Owner argues also that "[c]ommon sense counseled against

using ABB motors listed in the ABB Motor references in a wet cooling

tower" and that "one skilled in the art would have been dissuaded from using

them and would not have expected success using any of the combinations

that included the ABB Motor reference."  PO App. Br. 20–21; *see also* PO

Reb. Br. 9–10.

The Examiner cites ABB Motor for teaching that "direct drive

permanent magnet motors are known and can replace traditional indirectly

driven gearbox-type motors in any application."  RAN  28.  Patent Owner's

argument that ABB's motors in particular are not suitable for "typical" or

even "most" cooling tower applications fails to persuasively rebut this

finding.  PO Reb. Br. 9–10.  That is, on this record, we are unpersuaded that

the shortcomings Patent Owner experienced using specifically ABB's

motors in "typical" wet cooling tower applications, necessarily would be

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

present in "all" wet cooling tower applications that are encompassed by
Patent Owner's claims, broadly construed.  Namely, the disclosure of the
'028 patent does not exclude or discourage particular motors from being
used in all cooling tower application.

Moreover, we do not find that the recitation of "cooling tower" or
"wet cooling tower" in the claims, often located in the preamble only,
necessarily constrains the obviousness analysis to the full range of design
considerations specific to Patent Owner's particular problem.  In other
words, we do not find sufficient persuasive evidence that we should import
into the recited terms "cooling tower" and "wet cooling tower" the full range
of design constraints Patent Owner would have us read into them (*see* PO
App. Br. 12–20), even to the extent those constraints are discussed in Patent
Owner's Specification.  "Though understanding the claim language may be
aided by the explanations contained in the written description, it is important
not to import into a claim limitations that are not a part of the claim.  For
example, a particular embodiment appearing in the written description may
not be read into a claim when the claim language is broader than the
embodiment."  *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d
870, 875 (Fed. Cir. 2004).

To the extent Patent Owner argues that flaws in the motors described
in ABB Motor made them so unsuitable for use in a cooling tower and that
the reference teaches away from the use of permanent magnet motors in
such applications (PO Reb. Br. 11), we are unpersuaded of error.  A
reference may be said to teach away when a person of ordinary skill, upon
reading the reference, would be discouraged from following the path set out

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

in the reference, or would be led in a direction divergent from the path that was taken by the applicant. *In re Gurley*, 27 F.3d 551, 53 (Fed. Cir. 1994). Patent Owner's arguments do not persuade us that ABB Motor would have discouraged one skilled in the art from attempting to use permanent magnet motors in all wet cooling tower applications or would have led the skilled artisan on a divergent path from such as solution.

We also are unpersuaded of error based on Patent Owner's arguments that one skilled in the art would not have had a reasonable expectation of success when combining the motors disclosed in ABB Motor with other references. PO App. Br. 12–21; PO Reb. Br. 9–11. "Obviousness does not require absolute predictability of success." *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988). "For obviousness under § 103, all that is required is a reasonable expectation of success." *Id.* at 904. (citing *In re Longi*, 759 F.2d 887, 897 (Fed. Cir. 1985); and *In re Clinton*, 527 F.2d 1226, 1228 (CCPA 1976)). Patent Owner attests to numerous challenges it faced in adapting the ABB ACS800 VFD to its "beta-test motor." Rollins Decl. ¶ 35. The Examiner's rejection, however, proposes combining ABB's motors with ABB's VFD, not Patent Owner's beta-test motor. Even Patent Owner states that the "ACS800 VPD was designed for use with ABB's particular motors." PO App. Br. 9. We do not otherwise find sufficient persuasive argument or evidence that one skilled in the art would not have had a reasonable expectation of success combining the teachings of ABB Motor with the teachings of the other references to make the claimed invention.

Patent Owner also argues error because the rejections involving ABB Motor improperly rely on the reference for teaching the limitation "the

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

rotatable shaft being configured for connection to the fan hub," as recited in claim 1 and commensurately recited in the other independent claims.  PO App. Br. 21–23.  Patent Owner asserts that "the shafts of the ABB motors would require significant modification to fit a cooling tower fan hub."

We are unpersuaded of error, at least because the rejections using ABB Motor are not based on the teachings of the single reference but rather on what the combined teachings of multiple references would have taught or suggested to one skilled in the art.  *See, e.g.*, RAN 11–23.  One cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references.  *See In re Keller*, 642 F.2d 413, 426 (CCPA 1981); *In re Merck & Co.*, Inc., 800 F.2d 1091, 1097 (Fed. Cir. 1986).  "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references."  *Keller*, 642 F.2d at 425.  "Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art."  *Id.*

While we agree with Requester that ABB Motors discloses motors that are inherently configured for connection to some load, even if that load is not specifically identified, (TPR Resp. Br. 9), we also note that Smith and Hartman, one of which is also cited in each pending rejection, both at least suggest motors "configured for connection" to fan hubs.  *See, e.g.*, Smith (Figure 1); Hartman (Figs. 1–5).  *Accord* TPR Resp. Br 9.  Hence, we are not persuaded that the combined teachings of the references fail to teach or

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

suggest a rotatable shaft configured for connection to a fan hub as recited in claim 1, or commensurately recited in other independent claims.

*Rejections Over Hartman*

Patent Owner argues against the rejections that include Hartman (rejections 7–12 and 14) because Hartman fails to teach or suggest a motor directly driving a cooling tower fan, a motor shaft connected to a fan hub, and a permanent magnet motor mounted within a cooling tower.  PO App. Br. 24–27.  Patent Owner also argues one skilled in the art would not have an expectation of success combining Hartman with ABB Motor based on ABB Motor's unsuitability for cooling towers, which is Hartman's focus. *Id.* at 25.  Patent Owner also argues an absence of reasons to combine Hartman with the other references.

We see no error in the Examiner's reliance on the teachings of Hartman, either alone or in combination with the teachings of the other references, for at least the reasons stated by the Examiner (RAN 27) and Requester (TPR Resp. Br. 11).  Hartman depicts a motor shaft connected to a fan hub and directly driving the fan.  Hartman Figs. 1–5.  Hartman further discloses that the invention is used with cooling towers.  Hartman, Title. The pending rejections do not rely solely on Hartman for the teaching of permanent magnet motors in a cooling tower (Request 51–69; RAN 21–23. *Accord* RAN 27), and we do not find persuasive argument or evidence that the combined teachings of the references do not teach or suggest a permanent magnet motor within a cooling tower.  *See Keller*, 642 F.2d at 426.  We address Patent Owner's arguments that there is no reason to

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

combine the references, including Patent Owner's arguments specific to combinations that include Hartman, *infra*.

*Rejections Over Smith*

Patent Owner argues error in the rejections that include Smith (rejections 2–6 and 13) for reasons similar to those discussed *supra*. App. Br. 27–28. We are unpersuaded of error at least for the reasons stated by the Examiner (RAN 26) and Requester (TPR Resp. Br. 11). In particular, Patent Owner's argument that "Smith does not disclose monitoring of cooling tower air flow to implement a closed-loop control system" (App. Br. 27) is unavailing because it fails to consider what the combined teachings of the reference would have taught or suggested to one skilled in the art. *See Keller*, 642 F.2d at 426. At least Facão is also cited for claim limitations relating to monitoring air flow. *See, e.g.*, Request 44.

*Rejections Over Facão*

Patent Owner argues against rejections that include Facão (rejections 6 and 11–14) because Facão does not teach or suggest closed loop control of the motor speed based on feedback from an airflow sensor. App. Br. 28–30. We are unpersuaded of error because Patent Owner's arguments fail to consider what the combined teachings of the references would have taught or suggested to one skilled in the art (*see Keller*, 642 F.2d at 426) and for the additional reasons stated by the Requester (TPR Resp. Br. 12).

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

*Reasons to Combine*

To the extent we have not addressed specifically Patent Owner's
numerous arguments that the Examiner erred by improperly combining the
teachings of the various references (PO App. Br. 10–21, 23–24, 27–30; PO
Reb. Br. 4–11), we find the arguments unavailing for at least the reasons
stated by the Examiner (*see, e.g.*, RAN 16, 22, 23, 28–29) and articulated
throughout the Request (*see, e.g.*, Request 30–32, 51). We do not find
sufficient persuasive argument or evidence that Patent Owner's claimed
invention is more than the predictable use of prior art elements according to
their established functions—an obvious improvement. *See KSR Int'l Co. v.
Teleflex, Inc.*, 550 U.S. 398, 417 (2007).

Accordingly, we are unpersuaded of error in the Examiner's rejections
based on obviousness. *Supra*, Rejections 2–14.

CONCLUSIONS

We are unpersuaded of error in the Examiner's decision to reject
claims 12–22 and 24 under 35 U.S.C. § 112, first paragraph, for not
complying with the enablement requirement (rejection 1), and claims 1–12,
14–22, and 24 as obvious under 35 U.S.C. § 103 over various references
(rejections 2–14).

In view of our decision that all claims on appeal stand properly
rejected, it is unnecessary to reach the remaining issues. *Cf. In re Gleave*,
560 F.3d 1331, 1338 (Fed. Cir. 2009) (not reaching additional obviousness
rejections).

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2

## DECISION

Based on the record before us, we sustain the Examiner's decision to reject claims 1–22 and 24.

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a).

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956. *See* 37 C.F.R. § 41.79.

In the event neither party files a request for rehearing within the time provided in 37 C.F.R. § 41.79, and this decision becomes final and appealable under 37 C.F.R. § 41.81, a party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office. *See* 37 C.F.R. §§ 90.1 and 1.983.

## AFFIRMED

Appeal 2015-001464
Reexamination Control 95/002,286
Patent 8,111,028 B2


Patent Owner:

HARRIS BEACH/SYRACUSE
333 West Washington Street
Suite 200
Syracuse, NY  13202


Third Party Requester:

ABB INC. LEGAL DEPARTMENT-4U6
29801 Euclid Avenue
Wickliffe, OH  44092

(12) **United States Patent**     (10) **Patent No.:**     **US 8,111,028 B2**

Rollins et al.     (45) **Date of Patent:**     **Feb. 7, 2012**

---

(54) **INTEGRATED FAN DRIVE SYSTEM FOR COOLING TOWER**

(75) Inventors: **Patrick Rollins**, Canandaigua, NY (US); **George Lucas**, Hammondsport, NY (US)

(73) Assignee: **Prime Datum, Inc.**, Canandaigua, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 399 days.

(21) Appl. No.: **12/524,198**

(22) PCT Filed: **Sep. 23, 2008**

(86) PCT No.: **PCT/US2008/077338**

§ 371 (c)(1), (2), (4) Date: **Jul. 23, 2009**

(87) PCT Pub. No.: **WO2009/048736**

PCT Pub. Date: **Apr. 16, 2009**

(65) **Prior Publication Data**

US 2010/0045228 A1     Feb. 25, 2010

**Related U.S. Application Data**

(60) Provisional application No. 60/978,916, filed on Oct. 10, 2007.

(51) **Int. Cl.**
*F28D 5/00*     (2006.01)

(52) **U.S. Cl.** .................. 318/400.41; 318/268; 261/127; 261/DIG. 11

(58) **Field of Classification Search** .................. 318/268, 318/471–473, 481, 700, 400.01, 400.41; 261/127, 150, 158, DIG. 11

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 3,608,873 | A | * | 9/1971 | Furlong | 261/30 |
| 4,159,738 | A | * | 7/1979 | Sedille | 165/125 |
| 4,637,903 | A | * | 1/1987 | Bardo et al. | 261/24 |
| 5,028,356 | A | * | 7/1991 | Wiltz | 261/109 |
| 5,040,377 | A | * | 8/1991 | Braun et al. | 62/183 |
| 5,227,095 | A | * | 7/1993 | Curtis | 261/30 |
| 6,070,860 | A | * | 6/2000 | Kinney et al. | 261/30 |
| 6,208,054 | B1 | * | 3/2001 | Tajima et al. | 310/156.53 |
| 6,257,007 | B1 | | 7/2001 | Hartman | |
| 6,446,941 | B1 | * | 9/2002 | Maheshwari et al. | 261/130 |
| 6,600,249 | B2 | * | 7/2003 | Nelson et al. | 310/91 |
| 7,032,859 | B2 | * | 4/2006 | Mohr | 244/12.2 |
| 7,402,932 | B2 | | 7/2008 | Applegate | |

FOREIGN PATENT DOCUMENTS

JP     05-340690     12/1993

* cited by examiner

*Primary Examiner* — Bentsu Ro

(74) *Attorney, Agent, or Firm* — Raymond A. Nuzzo

(57) **ABSTRACT**

An integrated fan drive system for a cooling tower comprising a high-torque, low speed permanent magnet motor having a rotatable shaft, a fan comprising a hub that is directly connected to the rotatable shaft and a plurality of fan blades that are attached to the hub, and a variable frequency drive device in electrical signal communication with the permanent magnet motor to control the rotational speed of the permanent magnet motor. The high-torque, permanent magnet motor comprises no more than two bearings in operative association with the shaft. The variable frequency drive device has a variable frequency controller that has an input for receiving AC power and an output for providing electrical signals that control the operational speed of high-torque, permanent magnet motor. The variable frequency drive device also includes a user interface in electronic data signal communication with the variable frequency controller to allow a user to input motor speed control data.

**11 Claims, 6 Drawing Sheets**





**FIG.1**
PRIOR ART



FIG.2A



FIG.2B



FIG.3



FIG.4



FIG.5

US 8,111,028 B2

1

# INTEGRATED FAN DRIVE SYSTEM FOR COOLING TOWER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 60/978,916, filed Oct. 10, 2007. The entire disclosure of the aforesaid application No. 60/978,916 is hereby incorporated by reference.

## TECHNICAL FIELD

The present invention generally relates to a fan drive system for a wet cooling tower.

## BACKGROUND ART

Wet cooling towers are well known in the art and are used in a variety of industries for cooling fluids such as water. The primary use of large, industrial cooling tower systems is to remove the heat absorbed in circulating cooling water systems used in power plants, petroleum refineries, petrochemical and chemical plants, natural gas processing plants and other industrial facilities. The absorbed heat is rejected to the atmosphere by the evaporation of some of the cooling water in mechanical forced-draft or induced draft towers.

Cooling towers are widely used in the petroleum refining industry. Refining of petroleum cannot take place without cooling towers. Refineries process hydrocarbons at high temperatures and pressures. Cooling water is used to control operating temperatures and pressures. The loss of cooling water circulation within a refinery can lead to unstable and dangerous operating conditions requiring an immediate shut down of processing units. Cooling towers have become "mission critical assets" for petroleum refinery production. As demand for high-end products such as automotive and aviation fuel has risen and refining capacity has shrunk, the refineries have incorporated many new processes that extract hydrogen from the lower value by-products and recombined them into the higher value fuels, improving yield. Many of these processes are dependant on cooling to optimize the yield and quality of the product. Over the past decade, many refineries have been adding processes that reform low grade petroleum products into higher grade and more profitable products such as aviation and automotive gasoline. These processes are highly dependent upon the cooling towers to control the process temperatures and pressures that affect the product quality, process yield and safety of the process. In addition, these processes have tapped a great deal of the cooling capacity reserve in the towers leaving some refineries "cooling limited" on hot days and even bottlenecked. With most U.S. refineries operating well above 90% capacity with attractive profit margins, operating the refinery is critical to operating profit and to pay for the process upgrades implemented over the last decade.

Typically, a wet cooling tower system comprises a basin which holds cooling water that is routed through the process coolers and condensers in an industrial facility. The cool water absorbs heat from the hot process streams that need to be cooled or condensed, and the absorbed heat warms the circulating water. The warm circulating water is delivered to the top of the cooling tower and trickles downward over fill material inside the tower. The fill material is configured to provide a maximum contact surface, and maximum contact time, between the water and air. As the water trickles downward over the fill material, it contacts ambient air rising up through the tower either by natural draft or by forced draft using large fans in the tower. Many wet cooling towers comprise a plurality of cells in which the cooling of water takes place in each cell in accordance with the foregoing technique. Cooling towers are described extensively in the treatise entitled "Cooling Tower Fundamentals", second edition, 2006, edited by John C. Hensley, published by SPX Cooling Technologies, Inc.

Many cooling towers in use today utilize large fans, as described in the foregoing discussion, to provide the ambient air. The fans are enclosed within a fan cylinder that is located on the fan deck of the cooling tower. Drive systems are used to drive and rotate the fans. The efficiency and production rate of a cooling tower is heavily dependent upon the efficiency of the fan drive system. The duty cycle required of the fan drive system in a cooling tower environment is extreme due to intense humidity, icing conditions, wind shear forces, corrosive water treatment chemicals, and demanding mechanical drive requirements.

One commonly used prior art drive system is a complex, mechanical fan drive system that is similar to the type used in agriculture applications. This type of prior art fan drive system utilizes a motor that drives a drive train. The drive train is coupled to a gearbox, gear-reducer or speed-reducer which is coupled to and drives the fan. This prior art fan drive system is subject to frequent outages, a less-than-desirable MTBF (Mean Time Between Failure), and requires diligent maintenance, such as regular oil changes, in order to operate effectively. Furthermore, prior art gearboxes typically require a separate gear to reverse the rotational direction. One common type of mechanical drive system used in the prior art gearbox-type fan drive utilizes five rotating shafts, eight bearings, three shaft seals (two at high speed), and four gears (two meshes). This drive train absorbs about 3% of the total power. Although this particular prior art fan drive system may have an attractive initial cost, cooling tower end-users found it necessary to purchase additional components such as composite gearbox shafts and couplings in order to prevent breakage of the fan drive components. Many cooling tower end-users also added other options such as low-oil shutdown, anti-reverse clutches and oil bath heaters. Thus, the life cycle cost of the prior art mechanical fan drive system compared to its initial purchase price is not equitable.

In a multi-cell cooling tower, such as the type commonly used in the petroleum industry, there is a fan and prior art mechanical fan drive system associated with each cell. Thus, if there is a shutdown of the mechanical fan drive system associated with a particular cell, then that cell suffers a "cell outage". A cell outage will result in a decrease in the production of refined petroleum. For example, a "cell outage" lasting for only one day can result in the loss of thousands of refined barrels of petroleum. If numerous cells experience outages lasting more than one day, the production efficiency of the refinery can be significantly degraded. The loss in productivity over a period of time due to the inefficiency of the prior art mechanical fan drive systems can be measured as a percent loss in total tower-cooling potential. As more cell outages occur within a given time frame, the percent loss in total tower-cooling potential will increase. This, in turn, will decrease product output and profitability of the refinery and cause an increase in the cost of the refined product to the end user. It is not uncommon for decreases in the output of petroleum refineries, even if slight, to cause an increase in the price-per-barrel of petroleum and hence, an increase in the cost of gasoline to consumers. The effect of cell outages with respect to the impact of petroleum product prices is described

US 8,111,028 B2

3

in the report entitled "Refinery Outages: Description and Potential Impact On Petroleum Product Prices", March 2007, U.S. Department of Energy.

Other types of prior art fan drive systems, such as V-belt drive systems, also exhibit many problems with respect to maintenance, MTBF and performance and do not overcome or eliminate the problems associated with the prior art gearbox-type fan drive systems. One attempt to eliminate the problems associated with the prior art gearbox-type fan drive system is the prior art hydraulically driven fan system. Such a system is described in U.S. Pat. No. 4,955,585 entitled "Hydraulically Driven Fan System For Water Cooling Tower".

Therefore, in order to prevent supply interruption of the inelastic supply chain of refined petroleum products, the reliability and subsequent performance of cooling towers must be improved and managed as a key asset to refinery production and profit. An efficient and reliable fan drive system is required to maintain a relatively high cooling efficiency and prevent interruptions in production.

DISCLOSURE OF THE INVENTION

Accordingly, it is an object of the present invention to provide a fan drive system that substantially eliminates the aforementioned problems and disadvantages associated with prior art gearbox-type fan drive systems.

Thus, present invention is directed to, in one aspect, a fan drive system comprising a high-torque, low speed, permanent magnet motor having a rotatable shaft, a fan comprising a hub that is directly connected to the rotatable shaft and a plurality of fan blades that are attached to the hub, and a variable frequency drive device in electrical signal communication with the permanent magnet motor to control the rotational speed of the permanent magnet motor. The variable frequency drive device has a variable frequency controller that has an input for receiving AC power and an output for providing electrical signals that control the operational speed of the high-torque, low speed permanent magnet motor. The variable frequency drive device also includes a user interface in electronic data signal communication with the variable frequency controller to allow a user to input motor speed control data.

In a related aspect, the present invention is directed to the combination of a wet cooling tower having a fan deck, a fan cylinder positioned upon the fan deck, and a fan located within the fan cylinder. The fan comprises a hub to which are connected a plurality of fan blades. The combination further includes a high-torque, permanent magnet motor that has a rotatable shaft connected to the hub, and a variable frequency drive device in electrical signal communication with the permanent magnet motor to control the rotational speed of the permanent magnet motor. The variable frequency drive device comprises a variable frequency controller that has an input for receiving AC power and an output for providing electrical signals that control the operational speed of the high-torque, permanent magnet motor, and a user interface in electronic data signal communication with the variable frequency controller to allow a user to input data representing desired motor speeds. The combination further comprises a plurality of sensors in electronic data signal communication with the user interface to provide sensor data signals representing vibration and heat at the bearings of the high-torque, permanent magnet motor, heat of the motor stator, and air flow created by rotation of the fan.

Other objects of the present invention, as well as particular features, elements and advantages thereof, will be elucidated

4

in, or be apparent from, the following description and the accompanying drawing figures.

BRIEF DESCRIPTION OF THE DRAWINGS

Understanding of the present invention and the various aspects thereof will be facilitated by reference to the accompanying drawing figures, submitted for the purposes of illustration only and not intended to define the scope of the invention, in which:

FIG. 1 is an elevational view, partially in cross-section, of a fan cylinder supported by a fan deck of a cooling tower, a fan within the fan cylinder and a prior art gearbox-type fan drive system;

FIG. 2A is an elevational view, partially in cross-section, of a fan cylinder supported by a fan deck of a cooling tower, a fan within the fan cylinder and the fan drive system of the present invention;

FIG. 2B is a plot of motor speed versus horsepower for a high torque, low speed permanent magnet motor used in one embodiment of the fan drive system of the present invention;

FIG. 3 is a block diagram of the fan drive system of the present invention;

FIG. 4 is a graph illustrating a comparison in performance between the fan drive system of the present invention and a prior art gearbox-type fan drive system that uses a variable speed induction motor; and

FIG. 5 is a schematic diagram showing the fan drive system of the present invention in conjunction with a plurality of performance monitoring sensors.

BEST MODE FOR CARRYING OUT THE INVENTION

Referring to FIG. 1, there is shown a prior art mechanical fan drive system, and a portion of a wet cooling tower. The remaining portion of the wet cooling tower is not shown since the structure and operation of wet cooling towers is well known in the art. Fan cylinder 10 is positioned on fan deck 12 of the cooling tower. The prior art mechanical fan drive system comprises induction motor 14, drive shaft 16, couplings 18 and 20, and right-angle gearbox 22. Motor 14 is seated on and/or secured to fan deck 12. Gearbox or gear reducer 22 is mounted to or supported by fan deck 12. Gearbox 22 has a vertical shaft 24 that rotates upon rotation of drive shaft 16. As shown in FIG. 1, fan 27 is located within fan cylinder 10 and comprises hub 28 and fan blades 30 that are attached to hub 28. Vertical shaft 24 is connected to fan hub 28. Thus, rotation of vertical shaft 24 causes rotation of fan hub 28 and fan blades 30.

Referring to FIG. 2A, there is shown the fan drive system of the present invention. Similar to the view of FIG. 1, a portion of the cooling tower is only shown in FIG. 2A. The fan drive system of the present invention comprises variable frequency drive (VFD) device 50 and motor 52. In accordance with the invention, motor 52 is a high torque, low speed permanent magnet motor. Permanent magnet motor 52 has a high flux density. The superior results, advantages and benefits resulting from permanent magnet motor 52 are discussed in the ensuing description. VFD device 50 and permanent magnet motor 52 are mounted to or supported by fan deck 12. VFD device 50 is in electrical signal communication with permanent magnet motor 52 via cables or wires 54. Permanent magnet motor 52 has shaft 56 that rotates when the appropriate electrical signals are applied to permanent magnet motor

US 8,111,028 B2

5

52. Shaft **56** is connected to fan hub **28**. Thus, rotation of vertical shaft **56** causes rotation of fan hub **28** and fan blades **30**.

Referring to FIGS. **2**A and **3**, VFD device **50** comprises a variable frequency controller **60** and a user or operator interface **62**. VFD device **50** controls the speed, direction (i.e. clockwise or counterclockwise), and torque of permanent magnet motor **52**. AC input power is inputted into variable frequency controller **60** via input **64**. Variable frequency controller **60** converts the AC input power to DC intermediate power. Variable frequency controller **60** then converts the DC power into quasi-sinusoidal AC power that is applied to permanent magnet motor **52**. User interface **62** provides a means for an operator to start and stop permanent magnet motor **52** and adjust the operating speed of motor **52**. In a preferred embodiment, user interface **62** comprises a microprocessor, and an alphanumeric display and/or indication lights and meters to provide information about the operation of motor **52**. User interface **62** further includes a keypad and keypad display that allows the user to input desired motor operating speeds. VFD device **50** includes input and output terminals **70** and **72** for connecting pushbuttons, switches and other operator interface devices or controls signals. In a preferred embodiment, VFD device **50** further includes a serial data communication port **80** to allow VFD device **50** to be configured, adjusted, monitored and controlled using a computer. In one embodiment, VFD device **50** includes sensor signal inputs **82**, **84**, **86**, **88** and **89** for receiving sensor output signals. The purpose of these sensors is discussed in the ensuing description.

Referring to FIGS. **2**A and **5**, permanent magnet motor **52** is directly coupled to the fan hub **28**. Since permanent magnet motor **52** is controlled only by electrical signals provided by VFD device **50**, there is no drive shaft, couplings, gear boxes or related components as is found in the prior art gearbox-type fan drive system shown in FIG. **1**. In accordance with the invention, permanent magnet motor **52** is a high-torque, low speed motor. Permanent magnet motor **52** is of simplified design and uses only two bearings **90** and **92** (see FIG. **5**). Permanent magnet motor **52** includes stator **94**. Such a simplified design provides relatively high reliability as well as improved and cost-effective motor production. Permanent magnet motor **52** has relatively low maintenance with a three year lube interval. Permanent magnet motor **52** can be configured with sealed bearings. Permanent magnet motor **52** meets or exceeds the efficiency of Premium Efficiency Induction Motors. Permanent magnet motor **52** substantially reduces the man-hours associated with service and maintenance that would normally be required with a prior art, induction motor fan drive system. In some instances, permanent magnet motor **52** can eliminate up to 1000 man-hours of maintenance and service. Such reliability reduces the amount of cell outages and significantly improves product output. In one embodiment, permanent magnet motor **52** has the following operational and performance characteristics:

Speed Range: 0-250 RPM
Maximum Power: 133 HP/100 KW
Number of Poles: 16
Motor Service Factor: 1:1
Rated Current: 62 A (rms)
Peak Current: 95 A
Rated Voltage: 600 V

Drive Inputs: 460 V, 3 phase, 60 Hz, 95 A (rms max. continuous) FIG. **2**B shows a plot of speed vs. horsepower for high torque, low speed permanent magnet motor **52**. However, it is to be understood that the aforesaid operational and performance characteristics just pertain to one embodiment

6

of permanent magnet motor **52** and that motor **52** may be modified to provide other operational and performance characteristics that are suited to a particular application.

Referring to FIG. **4**, there is shown a graph that shows "Efficiency %" versus "Motor Speed (RPM)" for the fan drive system of the present invention and a prior art fan drive system using a variable speed, induction motor. Curve **100** pertains to the present invention and curve **102** pertains to the aforementioned prior art fan drive system. As can be seen in the graph, the efficiency of the present invention is relatively higher than the prior art fan drive system for motor speeds between about 60 RPM and about 200 RPM.

Referring to FIG. **5**, in a preferred embodiment, the fan drive system of the present invention further comprises a plurality of sensors **200**, **202**, **204**, **206** and **208** that provide sensor signals to sensor signal inputs **82**, **84**, **86**, **88** and **89**, respectively, of VFD device **50**. Sensors **200** and **202** are positioned in proximity to bearings **90** and **92**, respectively, of permanent magnet motor **52** in order to sense vibration and heat. Sensor **204** is positioned on stator **94** of permanent magnet motor **52** to monitor heat at stator **94**. Sensor **206** is positioned down stream of the air flow created by fan **27** to measure airflow. For purposes of simplifying FIG. **5**, fan **27** is not shown. Sensor **208** is located within the basin (not shown) of the wet cooling tower to sense the temperature of the water within the basin. All sensor output signals applied to sensor signal inputs **82**, **84**, **86**, **88** and **89** are inputted into user interface **62** of VFD device **50** and are then routed to an external processing device, such as computer **300**, via data port **80**. Computer **300** includes a display screen device **302** that enables a user or operator to visually monitor the data outputted by sensors **200**, **202**, **204**, **206** and **208**. Computer **300** further includes a user interface, e.g. keyboard, (not shown) that allows an operator to input commands. Computer **300** is configured to implement a reliability algorithm using the data outputted by sensors **200**, **202**, **204**, **206** and **208** and in response, output appropriate control signals that are inputted into user interface **62** via data port **80**. Such control signals can be used to adjust the speed of motor **52**. Thus, the sensors and computer **300** provide a feedback loop that:

    a) monitors vibrations and heat at the bearings of motor **52**;
    b) monitors heat at the stator of motor **52**;
    c) monitors airflow produced by fan **27**;
    d) monitors the temperature of the water in the cooling tower basin;
    e) provides a trim balance to compensate for fan-unbalance inertia on the cooling tower structure (i.e. "Hula Effect");
    f) alerts the operators to a "blade-out" situation and automatically reduces the speed of motor **52**;
    g) locks out a particular motor speed that creates resonance;
    h) alerts the operator to ice accumulation on fan blades **30** and automatically initiates de-icing operations; and
    i) routes the basin-water temperature data to other portions of the industrial process so as to provide real-time cooling feedback information that can be used to make other adjustments in the overall industrial process.

Thus, the fan drive system of the present invention provides many advantages and benefits, including:
    a) elimination of many components found in the prior art gearbox-type fan drives, such as drive shafts, couplings, bearings, shaft seals, etc.;
    b) elimination of oil changes;
    c) significant reduction in service and maintenance;
    d) ability to vary the speed of the permanent magnet motor over a relative wide range of speeds;

**7**

e) ability to reverse direction of the permanent magnet motor without any additional components;

f) consumption of significantly lower amounts of energy in comparison to prior art gearbox-type fan drive;

g) easy retrofit with existing fan thereby eliminating need to construct new cooling towers;

h) significant reduction in the occurrence of cell outages; and

i) provides significantly more cooling capacity in comparison to prior art gearbox-type fan drive.

The operational logic and system architecture of the present invention will provide the ability to optimize the cooling tower for energy efficiency (e.g. at night when it is cold) and to maximize cooling on hot days or when the process demands additional cooling or to avoid fouling of auxiliary systems such as condenser and heat exchangers.

Although the foregoing discussion is in terms of the applicability of the present invention to the petroleum industry, it is to be understood that the present invention provides benefits to any industry that uses wet cooling towers. Thus, the present invention has applicability to many industries that consume large amounts of energy and are process intensive, such as the power generation, petro-chemical, pulp and paper, chemical, glass, mining, steel and aluminum industries.

It will thus be seen that the objects set forth above, among those elucidated in, or made apparent from, the preceding description, are efficiently attained and, since certain changes may be made in the above construction and/or method without departing from the scope of the invention, it is intended that all matter contained in the above description or shown in the accompanying drawing figures shall be interpreted as illustrative only and not in a limiting sense. It is also to be understood that the following claims are intended to cover all of the generic and specific features of the invention herein described.

What is claimed is:

**1**. A drive system for driving a fan in a cooling tower, the fan comprising a fan hub and fan blades attached to the fan hub, the drive system comprising:

a high-torque, low speed permanent magnet motor comprising a motor casing, a stator and a rotatable shaft, the rotatable shaft being configured for connection to the fan hub, the motor further comprising a dual bearing system consisting of a pair of radial bearings that locate and support the rotatable shaft relative to the motor casing; and

a variable frequency drive device to generate electrical signals that effect rotation of the rotatable shaft of the motor at a rotational speed in order to rotate the fan.

**2**. The drive system according to claim **1** wherein the variable frequency drive device comprises electronic circuitry for receiving control signals that represent a particular rotational speed and generating electrical signals for the permanent magnet motor, wherein the electrical signals represent the rotational speed represented by the received control signals.

**3**. The drive system according to claim **2** further comprising:

vibration sensors located within the motor casing to measure vibrations at the radial bearings and output signals representing the measured vibrations; and

a plurality of heat sensors located within the motor casing to measure heat at the stator and at the radial bearings, the heat sensors outputting signals representing the measured heat.

**4**. The drive system according to claim **3** further comprising a processor for generating speed control signals for input

**8**

into the electronic circuitry of the variable frequency drive device, wherein the speed control signals vary the speed of the high-torque, low speed permanent magnet motor, the processor being configured to process the signals outputted by the vibration and heat sensors to determine vibration level and stator heat, respectively.

**5**. A method of installing a new fan drive system in a wet-cooling tower having a fan assembly that comprises a fan hub and a plurality of fan blades that are attached to the fan hub, the wet-cooling tower also having a preexisting fan drive system for driving the fan assembly, wherein the preexisting fan drive system has a gearbox, a drive shaft that drives the gearbox and an induction motor that drives the drive shaft, the method comprising:

disconnecting the gearbox from the fan hub and removing the gearbox;

removing the drive shaft;

removing the induction motor;

providing a high-torque, low speed permanent magnet motor comprising a motor casing, a stator and a rotatable shaft, the motor further comprising a dual bearing system consisting of a pair of radial bearings that locate and support the rotatable shaft relative to the motor casing; and

connecting the rotatable shaft of the motor to the fan hub.

**6**. The method according to claim **5** wherein the permanent magnet motor has a plurality of heat sensors located within the motor casing to measure heat at the stator and heat at the radial bearings.

**7**. The method according to claim **6** wherein the permanent magnet motor includes vibration sensors located within the motor casing to measure the level of vibrations at the radial bearings.

**8**. The method according to claim **5** further comprising the steps:

providing a variable frequency drive device to power the permanent magnet motor; and

electrically connecting the variable frequency drive device to the permanent magnet motor.

**9**. A wet-cooling tower comprising:

a fan deck;

a fan cylinder positioned upon the fan deck;

a fan assembly located within the fan cylinder, the fan assembly comprising a fan hub and a plurality of fan blades connected to the fan hub;

a basin for receiving water;

a high-torque, low speed permanent magnet motor comprising a motor casing, a stator supported by the casing and a rotatable shaft, the rotatable shaft being connected to the fan hub, the motor further comprising a dual bearing system consisting of a pair of radial bearings that locate and support the rotatable shaft relative to the motor casing;

a plurality of heat sensors located within the motor casing to measure heat at the stator and heat at the radial bearings and to output signals that represent the measured heat;

vibration sensors located within the motor casing to measure the level of vibrations at the radial bearings and output signals that represent the level of vibrations;

an air-flow sensor to measure the air-flow generated by the fan assembly and output signals that represent the level of air-flow generated by the fan assembly;

a temperature sensor in the basin to measure the temperature of the water in the basin;

a variable frequency drive device in electrical signal communication with the permanent magnet motor to control

US 8,111,028 B2

9

the rotational speed of the permanent magnet motor, the variable frequency drive device comprising electronic circuitry for receiving control signals that represent a particular motor rotational speed and generating electrical signals for the permanent magnet motor that correspond to the received control signals; and

a processor to process the signals outputted by the vibration, heat, air-flow and temperature sensors and generate control signals for input into the electronic circuitry of the variable frequency drive device.

10. A cooling tower, comprising:

a fan assembly comprising a fan hub and fan blades attached to the fan hub;

a high-torque, low speed permanent magnet motor comprising a motor casing, a stator assembly supported by the motor casing and a rotatable shaft, the rotatable shaft being connected to the fan hub, the motor further comprising a dual bearing system consisting of a pair of radial bearings that locate and support the rotatable shaft relative to the motor casing; and

a variable frequency drive device to generate electrical signals that effect rotation of the rotatable shaft of the motor at a rotational speed so as to rotate the fan.

11. A wet-cooling tower comprising:

a fan assembly comprising a fan hub and a plurality of fan blades connected to the fan hub;

a high-torque, low speed permanent magnet motor comprising a motor casing, a stator attached to the motor casing and a rotatable shaft, the rotatable shaft being

10

connected to the fan hub, the motor further comprising a dual bearing system consisting of a pair of radial bearings that locate and support the rotatable shaft relative to the motor casing;

a plurality of heat sensors located within the motor casing to measure heat at the stator and heat at the radial bearings and to output signals that represent the measured heat;

vibration sensors located within the motor casing to measure the level of vibrations at the radial bearings, the vibration sensors outputting signals that represent the level of vibrations;

an air-flow sensor to measure the air-flow generated by the fan assembly and output signals that represent the level of air-flow generated by the fan assembly;

a variable frequency drive device in electrical signal communication with the permanent magnet motor to control the rotational speed of the permanent magnet motor, the variable frequency drive device comprising electronic circuitry for receiving control signals that represent a particular motor rotational speed and generating electrical signals for the permanent magnet motor that correspond to the received control signals; and

a processor for processing the signals outputted by the vibration, heat and air-flow sensors and generating control signals for input into the electronic circuitry of the variable frequency drive device.

*    *    *    *    *

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I certify that I am counsel for Appellant Prime Datum, Inc. and that the foregoing OPENING BRIEF OF APPELLANT PRIME DATUM, INC. complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The OPENING BRIEF contains 13,985 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

Dated:  March 21, 2016                        /s/ Joseph Lucci
                                               Joseph Lucci
                                               Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing OPENING BRIEF OF

APPELLANT PRIME DATUM, INC. with the U.S. Court of Appeals for the

Federal Circuit via CM/ECF and served a copy on counsel of record via email to:

> Paul B. Hunt
> Joshua P. Larsen
> Barnes & Thornburg LLP
> 11 South Meridian Street
> Indianapolis, IN  46204
> paul.hunt@btlaw.com
> joshua.larsen@btlaw.com


Dated:  March 21, 2016                    /s/ Joseph Lucci
                                          Joseph Lucci